NATIONAL LABOR RELATIONS
BOARD, Petitioner.

v.

The COLONIAL PRESS, INC.,
Respondent.

No. 74–1304.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 17, 1974.

Decided Jan. 17, 1975.

Rehearing and Rehearing En Banc
Denied Feb. 26, 1975.

Joseph Oertel, Atty., National Labor Relations Board, Washington, D. C., made argument for petitioner.

Soren S. Jensen, Swarr, May, Smith & Andersen, Omaha, Neb., made argument for respondent.

Irving M. King, Chicago, Ill., made argument for intervenor.

Before GIBSON, Chief Judge, and LAY and STEPHENSON, Circuit Judges.

GIBSON, Chief Judge.

The National Labor Relations Board petitions, pursuant to Section 10(e) of the National Labor Relations Act as amended, 29 U.S.C. § 160(e), for enforcement of its decision and order[1] issued November 30, 1973, and reported at 207 N.L.R.B. No. 114 (1973). Local 203, Graphic Arts International Union, AFL–CIO, the charging party in the proceeding before the Board, was granted leave to intervene. In its decision the Board ordered reinstatement of nine persons categorized as unfair labor practice strikers. Six of the persons ordered to be reinstated had previously been lawfully discharged on August 21 and 22, 1972, for engaging in "long union meetings on company time." Unfair labor practice charges filed on their behalf were later found by the NLRB Regional Director and General Counsel to be without merit and were dismissed. The Company, on this appeal, is resisting enforcement of only that part of the Board's order relating to reinstatement of the six workers lawfully discharged.

The organizational campaign from which this dispute arose commenced in late 1971 and continued into 1972. It concerned an organizational unit of nine employees in the pressroom of the Company's Omaha, Nebraska, printing plant. The campaign was accompanied by employer conduct which was found by the Board in a prior proceeding to be violative of §§ 8(a)(1) and (3) of the Act.[2] On August 23, 1972, the pressroom employees, including those who had been lawfully discharged, commenced a strike against the Company in response to those unfair labor practices. Replacements were hired by the Company. The Board eventually found that the Company committed further unfair labor practices during that strike, consisting of telling employees to quit talking to the strikers, bad-mouthing the Union, engaging in surveillance of employees who talked to the picketers, and telling the employees that the Company would never sign a contract with the Union. During the course of the strike several of the lawfully discharged pressmen were asked by Company officials or straw bosses to come in to talk to the Company about going back to work. Most common among their invitations were statements such as, "My door is always open; any time you want to come down and talk to me you're welcome."

A contract agreement was finally reached between Company and Union in February, 1973. The Union, in two letters, promptly requested unconditional reinstatement of all strikers, including the six workers previously discharged for cause. When the strikers and former employees reported for work on February 23, the company president, Mr. Swoboda, refused to reemploy the six lawfully discharged workers. He told them they had been replaced, but of-

1. The Board's order directed the respondent Company inter alia (1) to cease and desist from discouraging union activity or interfering with employees' § 7 rights by means such as threatening and interrogating its employees, telling them not to talk with picketers, creating the impression of surveillance of employee union activity, or otherwise; and (2) to offer designated unfair labor practice strikers reinstatement to their former positions without prejudice to seniority or other rights, dismissing, if necessary, any employees hired as replacements, and to make the strikers whole for any loss of pay suffered.

2. In its prior order, reported as The Colonial Press, Inc., 204 N.L.R.B. No. 126 (1973), the Board found that the Company had violated § 8(a)(1) by interfering with, restraining, and coercing employees in the exercise of their § 7 rights when it made anti-union warnings, eliminated overtime work, and unilaterally changed rules. The Board also found that the Company had violated §§ 8(a)(1) and (3) by discriminatorily discharging employees because of their union activity.

fered to consider their applications for employment on a preferential basis if they wished to file them. In response, charges were filed alleging company unfair labor practices in violation of §§ 8(a)(1) and (3) of the Act. The Union complained that certain employees were threatened, and, without distinguishing between strikers and dischargees, claimed that the Company refused to reinstate unfair labor practice strikers and thereby discriminated against them because of their union activity.

The Administrative Law Judge concluded that the Company had in fact violated Section 8(a)(1) of the Act by coercively interrogating and threatening certain employees,[3] thus inhibiting their rights to engage in concerted activity under Section 7 of the Act. The judge further determined that although the Company's § 8(a)(1) violations had not prolonged the strike, its previous unlawful practices had in fact caused it. Thus, it was an unfair labor practice strike and those who were unfair labor practice strikers were entitled to reinstatement and back pay from the date they requested it. However, the judge also determined that because the six lawfully discharged workers were no longer employees and hence not unfair labor practice strikers, they were not entitled to reinstatement. In so doing, the judge rejected the Union's argument that the Company had condoned or forgiven the six lawfully discharged workers' misconduct by asking them to return to work, and that the six had thereby regained the status of employees who were on strike in response to the employer's unfair labor practices, having refused its invitations to return to work.

On appeal the Board affirmed the Administrative Law Judge's rulings, but, disagreeing with his findings on the issue of condonation, additionally found that the Company violated §§ 8(a)(1) and (3) by refusing to reinstate all strikers. The Board concluded that various informal statements made by Company managers were "unmistakable offers of reemployment and clear evidence of condonation by [the Company] * * * of the misconduct which had given rise to the earlier lawful discharges." The Board rejected as insignificant factual distinctions drawn by the Administrative Law Judge between the instant case and prior cases of alleged postdischarge condonation. To draw such distinctions, the Board commented, would "invite abuses of the purposes of the Act and an unwarranted dilution of the doctrine of condonation."[4] The Board concluded that statements by Company representatives inviting the strikers to return to work rescinded their previous discharges and waived the Company's right to rely on the discharge-provoking misconduct as a basis for denying reinstatement. In short, the Board concluded that the Company's statements reestablished an employment relationship between the Company and the six workers, so that the workers might enjoy the status of unfair labor practice strikers who are entitled to reinstatement.

## I. SECTION 10(b).

■ The Company argues, as a preliminary point on appeal, that the Board erred in considering evidence of events which occurred more than six months before the filing of the instant charges, March 6, 1973. It argues that Section

---

3. Bernard Nice and Tom Murtaugh (a bindery employee outside the pressmen's bargaining unit).

4. The decisions in Confectionery & Tobacco Drivers & Warehousemen's Local 805 v. N.L.R.B. [M. Eskin & Son], 312 F.2d 108 (2d Cir. 1963), and N.L.R.B. v. E. A. Laboratories, Inc., 188 F.2d 885 (2d Cir. 1951), were distinguished by the Administrative Law Judge (1) because they involved broken strike settlement agreements to which workers had responded, reestablishing their employment relationships; or (2) because they, along with most conventional condonation cases, may have involved only "tactical" discharges which in fact did not terminate employment, while the discharges in the instant case were true discharges which did terminate the six workers' status as employees.

10(b) of the Act, 29 U.S.C. § 160(b), prevents the Board from labeling the strike as an unfair labor practice strike because that determination must rest upon evaluation of Company conduct which occurred before the six-month limitations period. Section 10(b) was enacted for the purpose of stabilizing existing bargaining relationships by barring "litigation over past events 'after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused' * * *." Machinists Local 1424 v. N.L.R.B., 362 U.S. 411, 419, 80 S.Ct. 822, 828, 4 L.Ed.2d 832 (1960). Those purposes would not be advanced by adoption of the Company's argument in the instant case.

■ Granted, the Company's unfair labor practices which caused the instant strike occurred prior to the § 10(b) limitations period. Those practices were themselves fully recorded in litigation and declared by the Board to be violations of the Act.[5] This case fits within the first situation discussed in Machinists Local 1424 v. N.L.R.B., supra, 362 U.S. at 416–417, 80 S.Ct. 822.[6] The Board's ruling that the instant strikers were protesting unfair labor practices could not be said to be "inescapably grounded on events predating the limitations period * * *," Machinists Local 1424, supra, 362 U.S. at 422, 80 S.Ct. at 829, as the current complaint rests on failure to reinstate unfair labor practice strikers. Otherwise, the Board would never be able to punish an employer's refusal to reinstate unfair labor practice strikers after a strike lasting more than six

months and in which the employer's conduct complained of occurred before and after but not during the strike. N.L.R.B. v. Brown & Root, Inc., 203 F.2d 139, 145–146 (8th Cir. 1953).

## II. CONDONATION.

■ On the condonation issue, we think the Board has expanded and stretched that concept beyond its basic purpose and proper utility. The principle of waiver by condonation used in the context of labor relations is that, if after an employee commits acts of misconduct lawfully justifying his discharge, and thereafter the employer, fully cognizant of the acts, agrees not to discipline him, the employer may not thereafter rely on the same misconduct as the basis for discharging or refusing to reinstate the employee. Thus, the doctrine is properly invoked "only where there is clear and convincing evidence that the employer has completely forgiven the guilty employee for his misconduct—and agrees to a resumption of [the] company-employee relationship as though no misconduct had occurred." Packers Hide Association v. N.L.R.B., 360 F.2d 59, 62 (8th Cir. 1966).

■■ Condonation may not be lightly presumed. Plasti-line, Inc. v. N.L.R.B., 278 F.2d 482, 486–487 (6th Cir. 1960); N.L.R.B. v. Marshall Car Wheel & Foundry Co., 218 F.2d 409, 414 (5th Cir. 1955). Thus, to order reinstatement on the basis that an employer has condoned an employee's prior misconduct, the record must contain clear and convincing evidence that the employer has in fact agreed (1) to forgive the misconduct and

---

**5.** The Colonial Press, Inc., 204 N.L.R.B. No. 126 (1973).

**6.** As noted in Machinists Local 1424, supra, 362 U.S. at 416, 80 S.Ct. at 826:

It is doubtless true that § 10(b) does not prevent all use of evidence relating to events transpiring more than six months before the filing and service of an unfair labor practice charge. However, in applying rules of evidence as to the admissibility of past events, due regard for the purposes of § 10(b) requires that two different kinds of situations be distinguished. The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. [In the instant case, these were the Company's refusals to rehire the strikers.] There, earlier events [the prior unfair labor practices] may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events.
(Footnote omitted.)

"wipe the slate clean," and (2) to resume the former employment relationship with the employee. Moreover, resumption of the employment relationship necessarily rests on a mutual agreement. N.L.R.B. v. Community Motor Bus Co., 439 F.2d 965, 968 (4th Cir. 1971); *see* N.L.R.B. v. Cast Optics Corp., 458 F.2d 398, 404–405 (3rd Cir.), cert. denied, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972). Thus, as also found by the Administrative Law Judge, if the employment relationship was, in fact, terminated before the alleged condonation, something additional must be done by the former employee, in response to the Company's reemployment offer, in order to reestablish the employer-employee relationship. If, however, the employer-employee relationship has not been terminated and the employee seeks to return to work, as is the conventional fact pattern in labor condonation cases, then the employer's offer for the worker to return to work may be determinative.

■■ Therefore, in applying the condonation doctrine it is necessary to determine whether, before and after the employer's alleged condonation, the worker was in fact an "employee" within the meaning of the Act.[7] If he was not, then something evidencing the employee's acceptance is needed—in addition to the employer's agreement—to preclude the employer from refusing to reinstate him.[8] In the normal predischarge condonation setting,[9] however, such acceptance by the employee is not, strictly speaking, required because he is still an employee.

■■ In applying these principles to the instant case, we think the Board's order is unrealistic as it exaggerates the significance of the discharged employees' picketing and the somewhat general and ambiguous statements of the Company's representatives soliciting some of the dischargees to come in and talk to them about reemployment. The conversations appearing most frequently in the record utilized the phrase, "the door is always open." This and similar communications can at best amount only to preliminary invitations to negotiate reemployment. Obviously, in the context of the strike and the picketing the Company implied that to return to work at the time would be to renounce the Union. The Company made no unconditional offers for dischargees to return to work without penalty. These instances fall far short of constituting positive acts manifesting both forgiveness and agreement to resume the former employment relationship. N.L.R.B. v. Community Motor Bus Co., 439 F.2d 965 (4th Cir. 1971); Packers Hide Association v. N.L.R.B., 360 F.2d 59 (8th Cir. 1966); Plasti-line, Inc. v. N.L.R.B., 278 F.2d 482 (6th Cir. 1960). An enlargement of the salutary condonation principle to embrace such nebulous and preliminary overtures toward former employees would be detrimental to the purposes of the National Labor Relations

---

7. Under 29 U.S.C. § 152(3) the term "employee" includes:

> [A]ny employee * * * not * * * limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, *and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute* or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment * * *.

(Emphasis added.)
Even under the Act, whether or not a worker is an "employee" is *inter alia* a contract issue, and thus rests on evidence of the parties' mutually manifested intent.

8. The cases finding condonation after discharge contain evidence of acceptance by the workers in the form of some affirmative action in response to an unequivocal company settlement offer. Jones & McKnight, Inc. v. N.L.R.B., 445 F.2d 97, 101–102, 104 (7th Cir. 1971); Confectionery & Tobacco Drivers & Warehousemen's Local 805 v. N.L.R.B. [M. Eskin & Son], 312 F.2d 108, 112–113 (2nd Cir. 1963); N.L.R.B. v. Aladdin Industries, Inc., 125 F.2d 377, 382 (7th Cir.), cert. denied, 316 U.S. 706, 62 S.Ct. 1310, 86 L.Ed. 1773 (1942).

9. Union Twist Drill Co., 124 N.L.R.B. 1143, 1144 (1959); The Carey Salt Co., 70 N.L.R.B. 1099, 1100 (1946).

Act to promote more harmonious labor relationships between employers and employees, aside from ignoring contract principles relevant to establishing an employer-employee relationship.[10]

The Company's refusal to reemploy the six dischargees falls short of violating §§ 8(a)(1) and (3) of the Act in two important respects. First, as of August 22, 1972, the discharged workers were not employees of the Company and they did nothing thereafter to reestablish their employment prior to demanding reinstatement in February, 1973. Their joining of the picket line prior to the Company's alleged offers of reemployment cannot be considered as acceptance of the Company's offers. And the offers, if made at all, and in their most liberal interpretation, could only be to come back to work for the Company on the Company's terms—one of the terms being that persons accepting employment would work and not merely picket. Irrefragably, no "incantation of carefully constructed legal phrases," to use the Board's language, is needed for a worker to manifest his willingness to work.

Second, the preliminary invitations by Company representatives for the six dischargees to "come in to talk" cannot be characterized as unconditional offers of reemployment. This court recognized in Packers Hide Association v. N.L.R.B., supra, 360 F.2d at 63, that,

> [C]ondonation may not be lightly presumed from mere silence or equivocal statements, but must clearly appear from some positive act by an employer indicating forgiveness and an intention of treating the guilty employees as if their misconduct had not occurred.

The Board's conclusion that the Company offered unconditional reemployment and condoned the six employees' misconduct, thus overruling the decision of the Administrative Law Judge, is not supported by substantial evidence on the whole record. The Company's making of informal overtures and eventual refusal to rehire the six dischargees was not fairly described by the Board when it characterized it as "misleadingly agreeing to return its employees to work and then taking disciplinary action for something already forgiven."

The Board's reliance on N.L.R.B. v. New England Tank Industries, Inc., 302 F.2d 273 (1st Cir.), cert. denied, 371 U.S. 875, 83 S.Ct. 147, 9 L.Ed.2d 114 (1962), to supply the basis for its condonation theory is not persuasive. In *New England Tank,* which was essentially a discriminatory refusal to hire 49 of a predecessor's work force, the company had already offered three predecessor employees employment and the offer of employment had been accepted. Before the successor took over the operations the three men who had accepted employment learned of the discriminatory refusal to hire 49 of their co-workers because of union affiliation and joined in an unfair labor practice strike. The court held that since the three men had accepted the work offer and were working on September 30th and would have worked on October 1st, when the successor company took over, except for the protest of that company's unfair labor practices, these three men were employees and should properly be considered unfair labor practice strikers. The essential difference between *New England Tank* and the instant case is that in *New England Tank* the employees had not been discharged; rather, they had accepted employment and then, after finding out that their former co-workers were discriminatorily being denied employment because of union affiliations, joined in the unfair labor practice strike. In the instant case, at the time of the alleged condonation the six workers had been discharged and no longer enjoyed the status of employees, nor had they accepted any offers of reemploy-

10. The Second Circuit's comment that "the condonation principle * * * is more akin to the doctrine of waiver than to the technicalities of contract law," Confectionery & Tobacco Drivers and Warehousemen's Local 805 v. N.L.R.B. [M. Eskin & Son], 312 F.2d 108, 113 (2d Cir. 1963), should not be taken as an invitation to disregard contract principles entirely.

ment—such as the offers might have been. The mere offer of possible reemployment, without acceptance, could not have transformed the six dischargees into strikers and then, in turn, into unfair labor practice strikers entitled to reinstatement. The Company, after having lawfully discharged the six workers, stood absolved from any duty to reemploy them, and in refusing to do so was "simply exercising its normal right to select its employees." N.L.R.B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 259, 59 S.Ct. 490, 498, 83 L.Ed. 627 (1939).

We are unwilling to accept the dissent's argument that acceptance of the offers of reemployment, if made, may be found in the continued picketing by the dischargees. The Company was obviously looking for employees to maintain its production and as all of its "offers" were refused it had to hire new employees to take the place of those discharged and on strike. Assuming, *arguendo,* that offers of reemployment were made to the dischargees, acceptance in these circumstances could only be accomplished by returning to work. It adds nothing but rhetoric to the analysis of this situation to say that in doing so they would be strikebreakers. So would anyone hired by Colonial as replacements whether previously employed there or not. The dischargees were not employees nor strikers, having lost their employment relationship with the Company, but unemployed workers having no greater rights under the Act than any other unemployed worker wishing to work for Colonial. The dissent would create a new status, separate from employees and strikers, of pickets for pay. While we do not wish to nor do we in this opinion require the "incantation of carefully constructed legal phrases" to determine a worker's rights under the Act, neither do we think an employer must adopt and maintain an attitude of unmitigated hostility towards discharged employees to avoid legal penalties upon a refusal to rehire them.

Enforcement of the Board's order finding the Company's refusal to reinstate the six lawfully discharged workers[11] to be in violation of §§ 8(a)(1) and (3) of the Act is denied. In all other respects the Board's order is granted enforcement.

LAY, Circuit Judge (dissenting).

I respectfully dissent.

The majority opinion adopts the Administrative Law Judge's reasoning that there was no acceptance of the offers of reemployment and therefore there was no restoration of employee status to the discharged strikers. This reasoning is fallaciously premised on the supposition that the offer of reemployment sought a bilateral contract, *i. e.,* a promise for a promise. On the contrary, the employment relationship between the employees and the company is formed by a unilateral contract, *i. e.,* the promise to pay for the performance of services. The offers of reemployment sought acceptance by the resumption of employee services and did not depend on any formal bilateral agreement. Yet under the Administrative Law Judge's rationale, as adopted by the majority, the dischargees were required first to vocally accept employment with the illegal condition of denouncing the union before they could legally assume the status of an employee.[1]

---

11. They are: Gary Baker, David Birdsong, Wayne Blenden, Gilbert Classen, Jeff Louden, and Russell Sass.

1. Contrary to the majority's view the condonation, that is, the forgiveness of the dischargees' prior misconduct, is clearly supported by substantial evidence on the record as a whole. Even the Administrative Law Judge credited the statements made as clear manifestation that the dischargees were still acceptable as employees and that their jobs were open to them *provided* they renounced the union. The statements made were not, as suggested by the majority, simply a casual suggestion that the "door was always open" for negotiations. The Brief of the Intervenor, Local 203, Graphic Arts International, well summarizes the substantiality of this evidence:

—Bernard Nice, a striking employee and Union steward, testified that he was asked by Don Nice, about a month after the strike began on one of some fifteen similar occasions, to "come back in and bring your guys with you"; Don Nice admitted both

Under the facts presented this requirement is highly technical and unrealistic. It ignores the reality of the factual situation in which the offers were tendered.

As the Board so effectively stated in its opinion:

> [T]he rationale offered by Respondent and adopted by the Administrative Law Judge would require persons such as those involved here either to forsake their legitimate protests evidenced by their picketing activity and to become strikebreakers, or else would require them to be so counseled by those trained in the law as to carefully recite that they were willing to resume employee status but that they were continuing to engage in concerted activity in support of the protests of the work force against the employer's unfair labor practices. To force such persons to become strikebreakers would subvert the very purposes underlying the protection afforded to unfair labor practice strikers. To require an incantation of carefully constructed legal phrases seems to us to introduce wholly unnecessary and undesirable formalities and to make artificial our approach to problems of reality and substance.

Appendix at 29–30.

Assuming some form of acceptance of the offer of reemployment was necessary, that acceptance can be found in the resumption of the performance of employee functions. An unfair labor practice strike is a valid employee function. Continued participation in such a strike, after the offer of reemployment is made, can signify acceptance if it is accompanied by the mutual understanding that the employee desires to re-establish his employee status. Here, that understanding is readily apparent. There can be little doubt that the employees desired to return to their work *unshackled by any illegal condition that they denounce the union and their protected rights under the Act.* When the offers to reemploy them were made, the men continued as strikers along with the *oth-er unfair practice strikers.* When the settlement was reached and all strikers offered to return to work the company was well aware that those previously dis-

---

the specific statement and the fact of his frequent *discussions with Bernard.*

—Bernard Nice testified that, in January, 1973, Don Nice told him in an Omaha bar, following a reference by Bernard to the fact *that eight individuals were on strike,* that he (Bernard) could tell the other strikers that "there was jobs open, come on in, the door was open"; that testimony is unchallenged.

—Russell Sass testified that, in late September or early October, Don Nice told him that "the door was always open"; Nice admitted that he "possibly could have" made the statement.

—David Birdsong testified that, the day following his discharge, Richard Henderson called his home and left a message that Birdsong's job was there and all he had to do was tell the Company what he wanted within reason in terms of wages; this evidence is unrebutted.

—Even adopting Jay Swoboda's version of the conversation between he [sic] and Birdsong in the Marleybones Bar a week after the strike began, Swoboda told Birdsong that he could make up his own mind whether he wanted to stay out with the strikers or come back into the plant, asked Birdsong to call him when he made up his mind and offered to pay for any damage which might be done to his car if he decided *to return to work.* [Swoboda emphatically stated that at the time of his conversation with Birdsong he definitely had the right to come back to work if he wanted to.]

—Birdsong testified that Swoboda talked to him on the picket line about a week after the beginning of the strike and told him his job was there and all he had to do was go in and talk to him (Swoboda) about it; this conversation is not denied by Swoboda.

—Birdsong testified without contradiction that two or three weeks after the strike began, Richard Henderson spoke to Birdsong and Jeff Louden, and said they could have their jobs back and possibly a raise in pay.

—Birdsong testified without contradiction that, in January, 1973, Keith Kile said to him that he wished Birdsong would come in and talk to him.

—Jeff Louden testified that a few days after the picketing began, Richard Henderson, in one of at least ten such conversations, told him that he could have his job back, and possibly a raise in pay. This testimony was unrebutted.

Brief of Intervenor at 19–20. (Emphasis deleted.)

charged desired to return to their old jobs. The men were all seasoned workers and possessed good jobs; that their continued activity as strikers could be viewed by the employer as only detached and disinterested picketing is highly unreasonable.

The acceptance required by the majority could only be manifested by the dischargees' returning to their jobs and thus becoming strikebreakers. This would deny them their right to protected activity as employees under the Act. They would be denied the right to lawfully protest an unfair labor practice, as the other employees were doing, by lawfully striking. Thus, when the offers of reemployment were made, the action required of the dischargees to demonstrate their assent to resume the status of employees was the assumption of the role of an unfair labor practice striker rather than that of a working employee. This they did.

To require the discharged employee to do more, to accept the illegal condition and return to work, is to require the employees to forgo their right to strike, guaranteed by § 7 of the Act. This is a clear violation of the Act. *See* Standard Aggregate Corp., 87 L.R.R.M. 1273 (September 3, 1974).

I find the Board's analysis sound. I would enforce in full the Board's order.