THE HAWAII STATE TEACHERS ASSOCIATION, Appellant, *v.* THE HAWAII PUBLIC EMPLOYMENT RELATIONS BOARD AND THE BOARD OF EDUCATION OF THE STATE OF HAWAII, Appellees

NO. 6193

FEBRUARY 8, 1979

RICHARDSON, C. J., OGATA, MENOR AND KIDWELL, JJ., AND RETIRED JUSTICE KOBAYASHI FOR THE VACANCY

362

OPINION OF THE COURT BY MENOR, J.

This is an appeal by the Hawaii State Teachers Association (hereinafter HSTA) from a circuit court decision, which sustains a finding by appellee Hawaii Public Employment

Relations Board (hereinafter HPERB) that appellee Board of Education (hereinafter BOE) had not committed any prohibited practice within the meaning of HRS Chapter 89. We affirm.

This action had its genesis in a strike threat scheduled by the HSTA to go into effect on October 24, 1972. Before it could take place, however, HPERB, on October 20, 1972, obtained a preliminary injunction which put a halt to the threatened strike. We upheld the validity of the order in *Hawaii Pub. Emp. Rel. Bd. v. Haw. State Teachers Ass'n.*, 54 Haw. 531, 511 P.2d 1080 (1973). In March, 1973, the HSTA again threatened to strike, and on March 30, 1973, HPERB responded with an application for another injunction. The circuit court denied the petition, but at the same time advised the parties that it considered the injunction of October 20, 1972, to be in full force and effect. In spite of this, the HSTA, on April 2, 1973, commenced a strike which lasted until April 18, 1973, when the bargaining unit ratified a strike settlement agreement, also referred to as the "Kagel Agreement." Subsequently, we held that the strike was violative of HRS § 89-12(b),[1] and hence, illegal, a breach of the strike settlement agreement, in violation of HRS § 89-13(a)(8).

I.

The initial question for our determination is whether the computation of seniority credit in this case was a prohibited practice under the provisions of HRS §§ 89-13(a)(1) and 89-13(a)(3).

---

[1] That section provides:
(b) It shall be lawful for an employee, who is not prohibited from striking under paragraph (a) and who is in the appropriate bargaining unit involved in an impasse, to participate in a strike after (1) the requirements of section 89-11 relating to the resolution of disputes have been complied with in good faith, (2) the proceedings for the prevention of any prohibited practices have been exhausted, (3) sixty days have elapsed since the fact-finding board has made public its findings and any recommendation, (4) the exclusive representative has given a ten-day notice of intent to strike to the board and to the employer.

HRS § 89-13(a), in pertinent part, reads:
"It shall be a prohibited practice for a public employer or its designated representative wilfully to:

(1) Interfere, restrain, or coerce any employee in the exercise of any right guaranteed under this chapter;

\* \* \* \*

(3) Discriminate in regard to hiring, tenure, or any term or condition of employment to encourage or discourage membership in any employee organization."[2]

HSTA argues, with respect to HRS § 89-13(a)(1), that the application of the BOE's service credit formula to striking teachers would have a chilling effect upon the exercise by the union membership of their right to act collectively. It also asserts that the application of the formula to these teachers was an act of discrimination proscribed by HRS § 89-13(a)(3). We disagree.

Only interference with a lawful employee activity, or discrimination affecting the employee exercise of a protected right, may be the subject of a prohibited practice charge under the statute. HRS § 89-3 provides:

"Employees shall have the right of self-organization and the right to form, join, or assist any employee organization for the purpose of bargaining collectively through representatives of their own choosing . . . and to engage in *lawful, concerted activities* for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion. . . ." (Emphasis added)

The HSTA strike in this case was unlawful, *Hawaii Pub. Emp. Rel. Bd. v. Haw. State Teachers Ass'n., supra; Board of Education v. Haw. Pub. Emp. Bd., supra,* and was therefore

---

[2] The language of HRS § 89-13(a)(3) is nearly identical to that of Section 8(a)(3) of the National Labor Relations Act (29 U.S.C. § 158(a)(3)) which provides:

"It shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . ."

not a protected activity under the statute.

Federal cases on the subject are particularly instructive. In *Publicity Engravers, Inc.*, 161 N.L.R.B. 221, 222 (1966) the Board said:

> "[W]e find the Respondents' action did not constitute substantial interference with a protected activity, since it was responsive to the Union's unlawful strike . . . and was not directed toward restraining employees in their exercise of other, and protected, statutory rights."

*See also American Ship Bldg. v. Labor Board*, 380 U.S. 300 (1965).

"Discrimination" as contemplated by the federal statute refers to those discriminatory acts of the employer which affect the employee exercise of protected rights, *NLRB v. Great Dane Trailers*, 388 U.S. 26 (1967), and only interference with such rights may be the subject of an unlawful discrimination charge.[3] *See Auto. Workers v. Wis. Board*, 336 U.S. 245 (1949); *Labor Board v. Fansteel Corp.*, 306 U.S. 240 (1939); *N.L.R.B. v. Community Motor Bus Co.*, 439 F.2d 965 (4th Cir. 1971); *Mackay Radio and Telegraph Co. Inc.*, 96 N.L.R.B. 740 (1951).

Alternatively, however, HSTA contends that even if the strike was unlawful, the effect of the strike settlement agreement was to condone the strike, thus transforming it into a protected activity. For this contention, HSTA relies upon paragraph 3 of the strike settlement agreement which provides:

---

[3] Moreover, in order for discrimination to be a prohibited practice under Section 8(a)(3) of the National Labor Relations Act, it must be inherently anti-union or be motivated by anti-union animus. In Radio Officers v. Labor Board, 347 U.S. 17, 42-3 (1954), the Supreme Court explained:

> "The language of § 8(a)(3) is not ambiguous. The unfair labor practice is for an employer to encourage or discourage membership by means of discrimination. Thus this section does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited. Nor does this section outlaw discrimination in employment as such; only such discrimination as encourages or discourages membership in a labor organization is proscribed."

"There shall be no discrimination of any kind by any of the parties against any participants or non-participants in the strike."

Condonation occurs when the employer has forgiven the employee completely for his unlawful conduct. In *N.L.R.B. v. Colonial Press, Inc.*, 509 F.2d 850 (8th Cir. 1975), the principle of condonation was explained as follows:

"[I]f after an employee commits acts of misconduct lawfully justifying his discharge, and thereafter the employer, fully cognizant of the acts, agrees not to discipline him, the employer may not thereafter rely on the same misconduct as the basis for discharging or refusing to reinstate [or otherwise discriminating against] the employee." 509 F.2d at 854.

But this doctrine may be invoked only where there is clear and convincing evidence that the employer has completely forgiven the employee and has agreed to the resumption of the employer-employee relationship as though no misconduct had occurred. *Packers Hide Association v. N.L.R.B.*, 360 F.2d 59 (8th Cir. 1966). It requires a demonstrated willingness to "wipe the slate clean." *Confectionary & Tobacco Drivers and Ware. U. v. N.L.R.B.*, 312 F.2d 108 (2nd Cir. 1963). *See also National Labor Rel. Bd. v. Marshall Car Wheel & F. Co.*, 218 F.2d 409 (5th Cir. 1955); *Plasti-Line, Incorporated v. N.L.R.B.*, 278 F.2d 482 (6th Cir. 1960). Furthermore, condonation is a question of fact and "may not be lightly presumed from mere silence or equivocal statements." *National Labor Rel. Bd. v. Marshall Car Wheel & F. Co.*, supra.

The nondiscrimination provision, upon which HSTA relies, couched as it is in general terms and not being entirely unequivocal, does not constitute clear and convincing evidence of a demonstrated willingness on the part of the BOE to "wipe the slate clean." *Confectionary & Tobacco Drivers and Ware. U.*, supra. HPERB made no finding of condonation and, in our view, the provision is far less a waiver than an agreement that there will be no retaliatory action by the BOE against the striking teachers. We hold, therefore, that no condonation of prior wrongdoing occurred in this case.

## II.

Finally, we come to HSTA's principal contention that the application of the seniority credit computation formula to the striking teachers was discriminatory and hence, violative of the strike settlement agreement and of HRS § 89-13(a)(8).[4] We disagree.

Strike settlement agreements are to be construed and enforced in accordance with contract law, *Florida Education Association, Inc. v. Atkinson*, 481 F.2d 662 (5th Cir. 1973), and the interpretation of the terms of the agreement, like other forms of contract, depends on the intent of the parties. *In re Taxes, Aiea Dairy, Ltd.*, 46 Haw. 292, 380 P.2d 156 (1963); *reh. denied*, 46 Haw. 403, 380 P.2d 156. Nothing in the agreement indicated the specific type of conduct which the nondiscrimination clause was intended to prohibit. It simply stated that there shall be "no discrimination of any kind by any of the parties against any participants or non-participants in the strike."

Thus, the intent of the parties became a question of fact to be resolved by the factfinder, and HSTA had the burden of proving that what was intended by the parties was its claimed version of the agreement. *Dorr-Oliver, Inc. v. Webster Computer Corporation*, 30 Conn.Sup. 544, 300 A.2d 45 (1972). *Cf. Boteilho v. Boteilho*, 58 Haw. 40, 564 P.2d 144 (1977). In HPERB's view, HSTA had failed to carry its burden, and the Board specifically found:

> "There was no evidence or testimony presented that the matter of seniority was discussed, or even thought about, by the parties when the non-discrimination clause was included in the strike-settlement agreement."

---

[4] HRS § 89-13(a)(8) provides:

"It shall be a prohibited practice for a public employer or its designated representative wilfully to:

\* \* \* \*

(8) Violate the terms of a collective bargaining agreement."

HPERB then went on to conclude that "the Board is of the opinion that the matter of withholding or granting service credit for the period of the strike was not covered by the non-discrimination clause."[5]

Where reasonable minds may fairly differ as to whether certain evidence establishes a fact in issue, the factfinder is free to select that interpretation of the evidence which, in its sound judgment, most reasonably reflects the intent of the parties. *Shinn v. Edwin Yee, Ltd.*, 57 Haw. 215, 553 P.2d 733 (1976); *In re Taxes, Aiea Dairy, Ltd., supra.* Such findings will not be set aside on appeal unless found to be clearly erroneous. *Shinn v. Edwin Yee, Ltd., supra; Associated Engineers & Contractors, Inc. v. State,* 58 Haw. 187, 567 P.2d 397 (1977), *reh. denied,* 58 Haw. 322, 568 P.2d 512.

HPERB's interpretation of the nondiscrimination provision was the most reasonable, if not the only logical interpretation. To uphold the HSTA interpretation would lead to unjust and discriminatory results against those teachers who were not participants in the illegal strike. The so-called non-discrimination provision clearly and explicitly provided that there would be no discrimination of any kind against participants *and* nonparticipants alike. The record shows that there were nonstriking teachers who were on leave during April for perfectly valid reasons. But because they were not on paid status for the requisite period of time, they were not entitled

---

[5] In the application of the nondiscrimination provision to the BOE regulation governing eligibility for spring vacation pay, arbitrator Bertram T. Kanbara, in his binding arbitration decision issued prior to the filing of the present prohibited practice charge, reached a similar result. He concluded that by its terms the provision was prospective in its application and noted:

"It apparently was intended to stablize the situation between the parties after submittal of the matter to mediation-arbitration. It was not intended to and did not apply to antecedent events. . . .

". . .As discussed above, regulation 5201 K.1 was valid and applicable as a qualification for spring vacation pay, and the striking teachers had not met its requirements. Consequently, they were not eligible for spring vacation pay. The requirements of the said regulation were applied uniformly to all teachers who were not on paid status for a least one day of the week preceding spring vacation, both striking and nonstriking teachers alike. Accordingly, there was no discrimination within the meaning of the Kagel agreement."

to service credit for that month. To adopt the HSTA position would place these teachers in a clearly disadvantageous position vis-a-vis teachers who took part in the illegal strike. It would be unreasonable to assume that the BOE would have agreed to a provision discriminating against nonstriking teachers while favoring teachers involved in an illegal activity.

Moreover, we find that the service credit formula, as applied to the striking teachers, was neither discriminatory nor retaliatory. *Cf. N.L.R.B. v. Community Shops, Inc.*, 301 F.2d 263 (1962). *Compare, National Labor Rel. Bd. v. California Date Grow. Ass'n.*, 259 F.2d 587 (9th Cir. 1958). The teachers represented by HSTA were not treated any differently from other employees of the department who were on leave without pay. In the application of the formula, all teachers absent for more than one-half of the working days and not on paid status had the same loss of service credit whether or not their absence was the result of their participation in the HSTA strike. This was not a new policy implementation established with the intent to punish or to discriminate against the strikers for their union activities. *See National Labor Relations Bd. v. Winona Textile Mills*, 160 F.2d 201 (8th Cir. 1947). Consistent with the evenhanded application of the BOE's seniority credit computation formula to all employees of the department, some striking teachers who returned to work before the strike ended and were on paid status for the required number of days were granted seniority credit for the month of April.

It is undisputed that this method of computation, as reflected in the 5400 series of the BOE School Code, had been a departmental policy since the 1940's. The HSTA-BOE collective bargaining agreement Article XII, Leaves, itself recognized that "[l]eave policies provided for in the 5400 series of Administrative Regulations and applicable state statutes which were in effect on the execution date of this agreement shall remain in full force and effect for the duration of the agreement." Under Regulation No. 5401(D), only those employees on leave without pay while on military service or

professional improvement leave were entitled to service credit. All other employees were required to be on paid status for more than one-half of the total working days in the month in order to qualify. The teachers represented by HSTA in this action did not come within the exceptions outlined in Regulation No. 5401(D).

Affirmed.[6]

*Sean Kim (Gill, Park & Park,* of counsel) for appellant.

*Lawrence D. Kumabe,* Deputy Attorney General for Board of Education, Appellee.

*Sonia Faust* for Hawaii Public Employment Relations Board, Appellee.

### DISSENTING OPINION OF KIDWELL, J.

I do not agree with part II of the majority opinion and therefore must respectfully dissent from the conclusion of the court in this case. I would reverse upon the ground that treatment of the striking teachers as inferior in seniority status to that of teachers who remained at work during the strike constitutes discrimination in violation of the strike settlement agreement.

The issue between the parties is phrased as a question of entitlement to seniority credit. In real terms, the question is whether, upon a reduction of staff, striking teachers shall be selected for dismissal as against teachers who did not participate in the strike or participated less extensively. By reason of their participation in the strike, and for only that reason, certain teachers have been or will be deprived of employment in favor of teachers who did not strike. A clearer case of discrimination against the striking teachers is hard to imagine.

---

[6] HSTA has also questioned for the first time on appeal the validity, under the Hawaii Administrative Procedures Act (HAPA), HRS Chapter 91, of the BOE's seniority credit computation formula. Only under certain well-defined circumstances will we deviate from the rule that issues raised for the first time on appeal will not be considered by this court. See *Fujioka v. Kam,* 55 Haw. 7, 514 P.2d 568 (1973). This case is not one of them. Moreover, the BOE's computation was consistent with the policies reflected in the 5400 series of the School Code which were incorporated into the HSTA-BOE collective bargaining agreement.

Such discrimination would not constitute a prohibited practice were it not for the strike settlement agreement. This conclusion follows from the unlawfulness of the strike. However, the unlawfulness of the strike is not a relevant factor in considering whether discrimination against striking teachers is in violation of the strike settlement agreement. When the parties agreed that there should be "no discrimination of any kind . . . against any participants or nonparticipants in the strike", they invalidated the unlawfulness of the strike as justification for such discrimination. I read the strike settlement agreement as an unambiguous expression of intent that the employment status and job security of the strikers is to be not inferior to that of nonstrikers. No evidence that the parties intended otherwise has been pointed out. The lack of extrinsic evidence of the existence of the intent so clearly expressed in the agreement seems to me to be a meaningless circumstance.

The majority is troubled by what it sees as unfair treatment of nonstriking teachers who were absent on leave. The simple answer to this concern, I believe, is that the choices made by the BOE in its dealings with such teachers cannot provide a foundation for discriminatory treatment of striking teachers in violation of the strike settlement agreement. Having bound itself by the strike settlement agreement to give equal job security to the teachers who remained at work and those who went on strike, the BOE may have rendered it unfair to apply different standards in dealing with teachers who were on leave during the strike. If so, the status of these teachers may require adjustment. That question is not before us, and I am unable to perceive why its existence should lead to denial of the rights for which the striking teachers bargained.

I would hold that HPERB erroneously denied effect to the strike settlement agreement and would reverse the judgment of the circuit court.