PHILIP I. McNAMEE and CAROL McNAMEE, Plaintiffs-Appellants, *v.* BISHOP TRUST COMPANY, LIMITED, a Hawaii corporation, and WAILUPE PENINSULA COMMUNITY ASSOCIATION, a Hawaii corporation, Defendants-Appellees

NO. 6434

AUGUST 22, 1980

RICHARDSON, C.J., OGATA, MENOR, LUM AND NAKAMURA, JJ.

398

OPINION OF THE COURT BY RICHARDSON, C.J.

Plaintiffs-appellants Philip and Carol McNamee appeal from the First Circuit Court judgment dismissing their complaint in favor of defendants-appellees Bishop Trust Co., Ltd. and Wailupe Peninsula Community Association. We affirm.

In the case below plaintiffs filed a complaint seeking declaratory and injunctive relief after the Managing Committee of the Wailupe Peninsula Community Association (hereafter referred to as "WPCA") denied their plans for building a second-story addition to their existing one-story home in Wailupe Peninsula. Plaintiffs charged that defendants' action in disapproving their application was arbitrary and unreasonable. A three-day trial was held before the Honorable Toshimi Sodetani and Findings of Fact and Conclusions of Law were entered on September 10, 1976. The following facts and details provide the necessary background to the suit. Plaintiffs' home is located in Wailupe Peninsula, a man-made land mass constructed by Hawaiian Dredging Company, Ltd. in the 1940's. The property was subdivided into approximately 117 lots and leased for residential purposes by Hawaiian Dredging Company, Ltd. in the late 1940's. In 1955 the

Wailupe Peninsula Community Trust was established by the residents of the peninsula to purchase the property from Hawaiian Dredging Company, Ltd. In accordance with the terms of the trust, Bishop Trust Co., Ltd. was designated as trustee and issued a rent-free lease and an agreement of sale of the reversionary fee simple interest with respect to each residential lot subject to the trust. The vendees under the Agreement of Sale are the beneficiaries of the trust and are members of the WPCA, a non-profit corporation. Its purpose, as stated in the Charter of Incorporation, is to:

> generally promote the cultural, educational, social and economic welfare of the members of the corporation; *to preserve Wailupe Peninsula as an attractive residential district;* and to obtain a harmonious solution to all problems affecting the welfare of the members of the corporation and the community. (Emphasis added).

Section 1.02 of the Declaration of Trust states in part:

> The purpose of the Trust shall be the acquisition of Wailupe Peninsula referred to in Section 1.03 herein from Hawaiian Dredging Company, Limited, the operation and maintenance of all common facilities within the Wailupe Peninsula for the duration of the Trust, and the conveyance in fee simple upon termination of the Trust to the beneficiaries of the Trust as hereinafter provided of all property and funds held by the Trustee and the other purposes referred to herein, all for and in furtherance of the purpose of this Trust of *preserving an attractive residential district for the advantage of the residents of Wailupe Peninsula and the community at large.* (Emphasis added).

Section 4.05 designates a Managing Committee who shall direct the trustee in exercising his powers enumerated in Section 4.03.[1] The Managing Committee is elected by members of the WPCA and consists of seven members who serve

---

[1] The relevant portion of Section 4.03 reads:

*Duties of Trustee; Directions of Managing Committee; Audit.* The Trustee shall manage and in all respects carry out the purposes of this Trust, and shall in all discretionary matters concerning the Trust act upon and in accordance with

for staggered terms. Since its inception in 1955, the Managing Committee has held numerous meetings concerning the state of the subdivision and has conducted a number of projects to maintain its condition.[2] Among these matters the Committee has considered individual applications for constructing various additions to the residents' homes.[3]

Each lease of a residential lot in Wailupe Peninsula contains a number of covenants including the following:

The Lessee will first submit to the Lessor for approval in writing, plans, specifications and plot plans of any alteration or remodeling of the improvements on the demised premises costing in excess of ONE THOUSAND DOLLARS ($1,000). Not more than one building, nor more than one outbuilding, shall be erected on the premises.[4]

In accordance with this covenant, residents contemplating building additions over $1,000 are referred by the trustee directly to the Managing Committee who makes the discretionary decision whether to approve or disapprove the application. The trustee is then directed to respond to the applicant.

In July of 1973, plaintiffs purchased a house and lot fronting the ocean in Wailupe Peninsula. At the time of purchase

---

the directions of the Managing Committee. The Trustee may, however, whenever it shall deem it advisable so to do, request directions from the Managing Committee. Every direction by the Managing Committee shall be in writing, signed by not less than a majority of the members of the committee (or alternates serving during the temporary disability of committee members), and delivered to the Trustee at its offices in Honolulu. . . .

[2] This includes setting up a "Grounds Committee" responsible for checking on the neighborhood's yards, reminding individuals to maintain them in good condition as well as maintaining the entrance to the subdivision. The WPCA was also very active in controlling what was called the "Jug Handle Problem", in which the state attempted to divert traffic into Aina Haina through Wailupe Circle. The WPCA was successful in preventing this event from occurring. The WPCA also has a "Dog Control Committee" and hires security guards to regularly patrol the subdivision.

[3] These included granting variances for swimming pools and fences around swimming pools.

[4] Each agreement of sale of a residential lot in Wailupe Peninsula also contains the same covenant. The only differences are the substitutions of the words "Vendee" and "Vendor" for "Lessee" and "Lessor" and the omission of the word "demised" before "premises."

they were given a copy of the above-mentioned covenant and signed an agreement to abide by it. In January of 1975, the McNamees decided to expand their home and contacted an architect, Sam Sweitzer, to discuss preliminary plans for construction. These plans included a possible second story and Mr. Sweitzer informed the McNamees that there may be a restriction barring additions of this height. To investigate further, Dr. McNamee phoned Mr. Dean Wymer who was then the president of the WPCA. In this conversation Dean Wymer informed the doctor that second-story additions had not been approved in the past.[5] However, Dr. McNamee felt that this was not an absolute restriction and continued discussions with his architect on how best to enlarge his home. As a result of more talks and further planning, the McNamees concluded that a two-story plan was preferable.[6]

Sometime in the fall of 1975 Dr. McNamee contacted Ray Underwood, the then president of the WPCA, and informed him of his proposed plans. Ray Underwood told him that the Managing Committee would not approve second stories.[7] However, Dr. McNamee insisted that the Committee at least review his plans and an appointment was set up for the next board meeting. On November 3, 1975, Dr. and Mrs. McNamee and Sam Sweitzer presented their application for a second-story addition to the McNamee residence. The plans were discussed for thirty minutes and the Committee deliberated for about one and a half hours thereafter. The six members present unanimously voted to disapprove the application and Bishop Trust Company, Ltd. was instructed to so advise the McNamees. The McNamees subsequently filed suit in circuit court.

---

[5] Trial transcript at 111, 367.

[6] The McNamees did consider expanding the house while maintaining the one level. However, this would require extending the outline of the existing home which meant using up yard space. This plan would also reduce the view to the ocean and bring the house closer to the neighbors. Trial transcript at 57-59.

[7] Trial transcript at 115.

The main issue presented in this case is whether the trial court erred in finding the Managing Committee's decision to be reasonable and made in good faith.[8] We answer in the negative and find the trial court's decision to be correct.

I.

In its "Finding of Fact No. 21" the trial court found that the Managing Committee's disapproval of plaintiffs' plans was based on the Committee's opinion and judgment that second-story buildings tend to restrict privacy; that they are aesthetically offensive and therefore contrary to the trust purpose of preserving an attractive residential district; and that allowing one second-story building may lead to proliferation. The trial court found further that although plaintiffs' plans were well prepared and reasonable, this was not at issue.[9] The trial court concluded that because the Managing Committee's decision was not made in bad faith nor unreasonable it should be sustained.[10]

Covenants requiring submission of plans and prior consent before construction such as the approval clause in plaintiffs' lease and agreement of sale are commonly found in leases and deeds around the country. Most courts have found

---

[8] Plaintiffs raise a number of other issues which are not really germane to the case at hand. These include whether there existed changed circumstances in the subdivision such that the covenant should be abandoned and whether plaintiffs took the property free of the covenant because they had no actual or constructive notice of the specific restriction. While we will touch on these issues in our discussion of the case they are not crucial to resolution of the controversy and at times tend only to obscure what should be the main focus of the case.

[9] Finding of Fact No. 22.

[10] The trial court's focus on the reasonableness of the Committee's actions rather than on the reasonableness of plaintiffs' plans was well taken. Plaintiffs' presentation of their case was directed towards showing that their plans for construction were reasonable. However, this is not a question for a court either at the trial or appellate level to consider. The body most suited for this determination was the WPCA's designated board — the Managing Committee. The trial court's task was to see that the Committee's decision was not arbitrary or made in bad faith. In turn we are limited in our review to whether this determination was supported by substantial evidence.

these approval clauses to be valid and enforceable as long as the authority to consent or approve is exercised reasonably and in good faith. *See generally Annot., Validity and Construction of Restrictive Covenant Requiring Consent to Construction on Lot*, 40 A.L.R.3d 864 (1971). In *Hannula v. Hacienda Homes, Inc.*, 34 Cal.2d 442, 211 P.2d 302 (1949), plaintiff brought a declaratory action to build a house on her lot. The restriction in her deed required plans for a house or structure to be submitted to defendant realty company for prior approval. Defendant determined that the plans were unsuitable and the Supreme Court of California affirmed this determination. The court first stated the applicable rule that such restrictions are valid and enforceable but that the determination must be reasonable and made in good faith. Although defendant had no framework of specific restrictions upon which approval was based, the court saw the main issue to be the defendant's authority to decide that the lot was inadequate. Because defendant's action was not arbitrary or unreasonable its decision was affirmed.

In *Hollingsworth v. Szczesiak*, 32 Del. Ch. 274, 84 A.2d 816 (1951), a similar restriction was contained in a deed. Defendants there were sued because they failed to seek prior approval of plans from the building committee. The Court of Chancery of Delaware stated that provisions authorizing a committee to approve or disapprove plans will be enforced when clear and reasonable and for the general benefit of the whole development. The same court in *Alliegro v. Home Owners of Edgewood Hills*, 35 Del. Ch. 543, 122 A.2d 910 (1956), reiterated this rule in a similar situation. Plans were submitted and denied by the building committee as "marginal in every respect below standards of other recently rejected houses." Writing for the court, Vice Chancellor Marvel recognized that a restrictive covenant reserving the power to reject building plans will be upheld when it is not exercised unreasonably or arbitrarily. *Bailey Development Corporation v. MacKinnon-Parker, Inc.*, 60 Ohio App.2d 307, 397 N.E.2d 405 (1977) (absent specific written restrictions, plaintiff's judgment in deciding whether to approve or disapprove defendant's plans must be measured against the standards of

good faith and reasonableness); *Snowmass American Corporation v. Schoenheit*, 524 P.2d 645 (1974) (finding that architectural control committee acted in good faith and in reasonable manner in failing to approve lot owner's plans supported by evidence); *Syrian Antiochian Orthodox Archdiocese of New York and All of North America v. Palisades Associates*, 110 N.J. Super. 34, 264 A.2d 257 (1970) (covenant prohibiting erection of structures or improvements unless plans are approved by grantor was valid and enforceable even though no objective standards are set forth in covenant); *Rhue v. Cheyenne Homes, Inc.*, 168 Colo. 6, 449 P.2d 361 (1969) (refusal to approve plans to move Spanish style home into new subdivision was reasonable, in good faith and in harmony with covenant's purposes); *Winslette v. Keeler*, 220 Ga. 100, 137 S.E.2d 288 (1964) (covenant requiring prior approval is valid and enforceable and rejection must be exercised reasonably and in good faith).

In *Friedberg v. Riverpoint Building Committee*, 218 Va. 659, 239 S.E.2d 106 (1977), the Supreme Court of Virginia reviewed a case in which plaintiff had started construction on her lot without prior submission of the plans to the subdivision's building committee in accordance with the restrictive covenant set forth in the deed. The builder was notified of the prior approval requirement and plans were submitted to the Committee. However, they were rejected because the proposed home consisted of one story and contained less than 3,000 square feet without dormer windows and because the original site had been subdivided into three building lots. The court found that these standards (which had been consistently applied to previous applications) were reasonable. The Chairman of the Committee had testified at trial that by the end of World War II the subdivision consisted of only six homes — three large ones and three smaller ones with dormer windows. As development progressed after 1946, the Committee established the standard of requiring all homes in Riverpoint to have two useable stories or if they contained only one story that it be at least 3,000 square feet and have dormer windows to give the impression that the home had more useable space. The Committee conceded that plaintiffs'

was a "nice house" and "expensive" but that the Committee could not function properly in administering the restrictions unless the same standard was applied to all lot owners. The Virginia Supreme Court affirmed the Committee's decision and found the prior consent clause valid and the Committee's standards to have been applied reasonably. The Committee's determination that the inside dimension of a proposed building as it affected the exterior appearance was an important consideration in defendant's nurturing and controlling the growth of the residential community.

A few cases found a building committee's disapproval of plans to be unreasonable. In *Donoghue v. Prynnwood Corporation*, 356 Mass. 703, 255 N.E.2d 326 (1970), the homeowner sought declaratory and injunctive relief concerning a restrictive provision in a deed to him from Prynnwood Corporation. The Supreme Judicial Court of Massachusetts recognized that the restriction requiring prior approval before construction plans may be undertaken is enforceable if the power to do so is exercised reasonably. The court found the corporate officer's disapproval to be arbitrary. The officer (the sole shareholder and principal officer of the corporation) had not enforced similar covenants against others and would have approved the plans had it not been for the objections of the neighbors.

In *LeBlanc v. Webster*, 483 S.W.2d 647 (1972), the Missouri Court of Appeals found that prior consent was unreasonably withheld where defendants sought to build their house with a driveway requiring a fill to be made to approach the garage and fills on the sides and front of the house. Plaintiffs claimed the driveway would be unsightly and out of harmony with the surroundings because of the excess fill. However, they were the only ones who so claimed and no evidence of diminution of value appeared, nor were other violations of basic restrictions shown. The evidence also demonstrated that fills and retaining walls were common in the area.

In *Boiling Spring Lakes Division of Reeves Telecom Corporation v. Coastal Services Corporation*, 27 N.C.App. 191, 218 S.E.2d 476 (1975), the interpretation of an approval

clause was again at issue. The developer-grantor represented to potential buyers that they could construct homes of 845.8 square feet. Defendants contemplated construction of a 768 square-foot two-story dwelling and submitted plans to this effect. The Court of Appeals of North Carolina gave weight to the general rule that a restrictive covenant requiring approval of house plans is enforceable only if the exercise of the power is reasonable and in good faith. However, in applying that test, the court found the corporation's disapproval to be unreasonable. All advertising had been directed to low income groups and purchasers were given the impression that they could erect small homes. Furthermore, some deviations were allowed for constructing smaller homes and there was no evidence that the policy applied only to the ground floor. Under these circumstances the court found that approval should have been granted.

All the cases thus reviewed recognized that covenants requiring prior approval were valid and their enforceability turned on whether approval was reasonable and made in good faith. This determination was based on the facts and circumstances of each individual case. Here, the trial court found that the Managing Committee's reasons for disapproving the McNamees' application were threefold:

(1) that second-story buildings tend to restrict privacy;

(2) that second-story buildings are aesthetically offensive and therefore contrary to the purpose of the Trust — to preserve an "attractive residential district"; and

(3) that allowing one second-story building may lead to proliferation.

These findings are supported by the record.[11] Another finding supported by the record is the fact that the Managing Committee had consistently and uniformly disapproved all requests for second-story additions to homes in Wailupe

---

[11] Trial transcript at 260, 280, 367-370, 394.

Peninsula.[12] Additionally, the court found that plaintiffs had actual notice of this fact.[13] However, even had plaintiffs not had notice of this particular policy it was sufficient that they knew and in fact agreed to abide by the covenant requiring prior approval from the Managing Committee. As long as the Committee's decision was reasonable and in good faith it will be upheld.

The trial court found that the 117-lot residential community was composed largely of single-family, single-story homes. As stated earlier, the trust instrument designated that its purpose was to preserve an "attractive residential district" for its residents. The WPCA's Charter of Incorporation also include this objective. Testimony by two real estate appraisers representing both parties was conflicting as to the effect of two-story homes on the attractiveness of the subdivision. One, Mr. Philip Won, stated that the prohibition on construction of second stories would have a favorable effect on the fair market value of real estate in the peninsula.[14] The other, Mr. Robert Hastings, testified that the proposed second story to the McNamees' home would tend to enhance the value of the other Wailupe properties.[15] It was reasonable for the Managing Committee to make its own determination, as elected representatives of the community, that maintaining a mainly one-story subdivision was "attractive." The fact that

---

[12] The record shows that in 1970 the WPCA adopted a formal resolution that it would not approve any plans submitted to it contemplating construction higher than one story. In 1970 one application for a second-story addition was denied (the "Ching application"). A previous application had been granted in 1961 after considerable controversy and discussion. This was the "Gabor application" but in this situation it was one of the three existing second-story houses. The applicants sought to add onto the already existing second story. In April of 1975, two applications for second-story additions were expressly disapproved (just six months before plaintiffs submitted their request).

[13] Plaintiff Dr. McNamee's conversation with Sam Sweitzer, trial transcript at 111, Dean Wymer at 367 and Ray Underwood at 115.

[14] Trial transcript at 416.

[15] Trial transcript at 219.

an expert in the appraisal of real estate supported this judgment is further evidence of its reasonableness.

Moreover, it was shown that many homes in the subdivision had swimming pools and substantial yardspace and that two-story additions would infringe upon the privacy of the swimmers as well as those engaged in other outdoor activities.[16] This too was a reasonable consideration. Finally, the WPCA believed that if it granted the McNamees' application as an exception or variance to its previous policy, it would have to do the same to all subsequent requests.[17] This fear was justified especially in light of the fact that plaintiffs themselves point to existing two-story houses as justifying their request. As in the *Friedberg* case, *supra*, the Committee here could not function properly in administering restrictions unless the same standard is applied to all lot owners.

Plaintiffs raise an additional argument to promote their appeal. They argue that because of changes in the community it would be inequitable to enforce the restriction under the doctrine of "changed circumstances." In *Sandstrom v. Larsen*, 59 Haw. 491, 583 P.2d 971 (1978), we had occasion to review a very similar situation involving a restrictive covenant prohibiting additions exceeding one and a half stories. Plaintiffs there had already built a second story and sought to appeal the trial court's granting of a mandatory injunction ordering removal of the top story of their building. Plaintiffs advanced the theory that the covenant had been abandoned because other lots with second-story structures existed within the subdivision. We articulated the test for finding

---

[16] Trial transcript at 368-369, Minutes of Special Meeting on November 11, 1975.

[17] In fact this was one of the major considerations in rejecting other applications for second stories. As Beverly Payne, one of the residents of Wailupe Peninsula and a member of the Managing Committee testified at trial:

Q. [COUNSEL]  Will you state the reasons to the Court why you voted against the proposal?

A. [PAYNE]  To me it was a Pandora's Box. I didn't see how as a director I could ever stop someone else from building a second story or putting in windows at a later — or doing what we don't like.

Trial transcript at 280.

abandonment: "[I]t must be shown that the lot owners of the subdivision acquiesced in substantial and general violations of the covenant within the restricted area." *Id.* at 497. However, we failed to find any evidence supporting such acquiescence. Of the houses containing two stories, one had been specifically exempted from the covenant at the time it was filed; another was exempted because it was located next to a hillside traversing the perimeters of the subdivision and did not interfere with any of the other homeowners' views; others were located against the hillside at the rear of the subdivision and thus were never covered by the terms of the original height restriction due to their location next to the hillside. Therefore the purpose for which the covenant was imposed had not been defeated. As to the doctrine of "changed circumstances", also urged by the parties, we said: "[A]ny 'change in conditions must be so great or radical as to neutralize the benefits of the restriction and destroy its purpose.' "*Id.* at 498. Moreover, we stated that "if the benefits of the original restriction can still be realized for the protection of the subdivision's properties, no sufficient change of conditions will be recognized so as to defeat the restriction." *Id.* In support of their "changed circumstances" contention plaintiffs pointed to the construction of a thirteen-story condominium in close proximity to the subdivision resulting in partial obstruction of the subdivision's view. However, we maintained that the original intent of the covenant was still preserved because the subdivision's value was enhanced rather than diminished. The condominium's presence made the remaining view all the more valuable and worthy of preservation.

Here, neither abandonment nor changed circumstances have occurred. The only three two-story houses in the 117-house subdivision were constructed prior to the trust's inception in 1955. The only possible "change" was to the Gabor house in 1961. There an application to construct an addition onto one of the already existing second-story houses was granted. However, since then, no other two-story applications have been granted. Thus the so-called change was not so great nor so radical as to neutralize the benefits of a single-

story subdivision. The purpose of the restrictive covenant for prior approval and the policy to maintain a low-rise peninsula for privacy, aesthetic and practical reasons has not been destroyed. We find plaintiffs' arguments to be without merit.

We are not convinced that the trial court's decision was clearly erroneous. *Molokoa Village Development Corp., Ltd. v. Kauai Electric Co., Ltd.*, 60 Haw. 582, 593 P.2d 375 (1979); *Hawaii State Teachers Association v. Hawaii Public Employment Relations Board and the Board of Education of the State of Hawaii*, 60 Haw. 361, 590 P.2d 993 (1979). While a restrictive covenant prohibiting the sale of property to racial minorities has been found to be unenforceable by the United States Supreme Court in *Shelley v. Kraemer*, 334 U.S. 1 (1948), private covenants such as in the instant case are enforceable.[18] The Managing Committee's decision to reject the plaintiffs' application was reasonable and made in good faith and, accordingly, the trial court's decision is affirmed.

*Wayne Nasser (Ashford & Wriston* of counsel) for plaintiffs-appellants.

*William M. Swope* and *Richard R. Clifton (Bernice Littman* with them on the brief; *Cades Schutte Fleming & Wright* of counsel) for defendants-appellees.

---

[18] Other covenants entered for the purpose of protecting a view have been enforceable. Sain v. Silvestre, 78 Cal. App.3d 461, 144 Cal. Rptr. 478 (1978); Sandstrom v. Larsen, 59 Haw. 491, 583 P.2d 971 (1978); McDonough v. W. W. Snow Construction Co., Inc., 131 Vt. 436, 306 A.2d 119 (1973); Seligman v. Tucker, 6 Cal. App.3d 691, 86 Cal. Rptr. 187 (1970); King v. Kugler, 197 Cal. App.2d 651, 17 Cal. Rptr. 504 (1961); Snashall v. Jewell, 228 Or. 130, 363 P.2d 566 (1961). *See also, Annot., Restrictive Covenant as to Height of Structure or Building*, 92 A.L.R.2d 878 (1963).