122 P.3d 267

**VILLAGE PARK COMMUNITY ASSOCIATION, Plaintiff–Appellee and Cross–Appellant,**

v.

**Steven NISHIMURA and Elizabeth Nishimura, Defendants–Appellants and Cross–Appellees.**

**No. 26061.**

Intermediate Court of Appeals of Hawai'i.

Sept. 16, 2005.

Certiorari Dismissed Nov. 14, 2005.

Terrance M. Revere, Brian A. Bilberry, and Jacqueline E. Thurston (Motooka, Yamamoto & Revere), Honolulu, on the briefs, for Defendants–Appellants and Cross–Appellees.

William J. Deeley, Dennis W. King, and Charles R. Prather (Deeley, King & Pang), Honolulu, on the briefs, for Plaintiff–Appellee and Cross–Appellant.

BURNS, C.J., and FUJISE, J.; with FOLEY, J., Concurring Separately and Dissenting.

### Opinion of the Court by BURNS, C.J.

Plaintiff–Appellee and Cross–Appellant Village Park Community Association (the Association) is a Hawai'i nonprofit corporation whose members are the owners of residential properties at the Village Park Community, a planned residential community. Defendants–Appellants and Cross–Appellees Steven Nishimura and Elizabeth Nishimura (Defendants or the Nishimuras) are co-owners of a house and lot within the Village Park Community.

The Nishimuras appeal, and the Association cross-appeals, from the Final Judgment entered by Judge Sabrina S. McKenna on September 3, 2003 in the Circuit Court of the First Circuit. This Final Judgment states, in relevant part, as follows:

*In Count Two,* requesting injunctive relief, judgment is entered in favor of [the Association] and against [the Nishimuras} for this:

(1) mandatory injunction requiring [the Nishimuras] to remove the deck, . . ., with [the Nishimuras] having 60 days from the effective date of this Final Judgment to complete such removal and, if [the Nishimuras] fail to do so by that date, the [Association] is authorized to enter the Property to effectuate such removal, and thereafter move the court for an award of costs and expenses incurred, including attorneys' fees, with supplemental judgment to enter for approved amounts;

(2) mandatory injunction requiring [the Nishimuras] to repaint the iron railings on the retaining wall and the fence posts for the 30 inch wall parallel to the back boundary of the Property in a color complementary to their main dwelling unit, with the color to be designated in writing by [the Association] within 45 days of the effective date of this Final Judgment, with [the Nishimuras] having 30 days therefrom to complete said repainting and, if [the Nishimuras] fail to do so, the [Association] is authorized to enter the Property to effectuate such repainting, and thereafter move the court for an award of costs and expenses incurred, including attorneys' fees, with supplemental judgment to enter for approved amounts.

Judgment shall enter in favor of [the Nishimuras] and against [the Association] with respect to the remaining requests for mandatory injunctive relief in Count Two.

Judgment is also entered in favor of [the Association] and against [the Nishimuras] for $17,280 in reasonable attorneys' fees.

We affirm.

The March 13, 1979 Declaration of Protective Covenants for Village Park Community (the Declaration) states, in Section 4.02, in relevant part,

(a) No construction or reconstruction of any improvement, alteration, repair or refinishing of any part of the exterior of an existing improvement or any other exterior work, which has a cost exceeding $1,000.00 shall be commenced or continued upon any lot unless the Owner thereof first obtains the approval of the Design Committee. . . .

. . . .

(c) Upon the completion of any construction, reconstruction, refinishing, alteration, repair or other work for which approved plans and specifications are required pursuant to this section, the Owner shall give written notice thereof to the Design Committee. . . .

. . . .

(h) In the event of any violation of the provisions of this section, the Association may take any and all reasonable steps to restore the lot upon which such violation

has occurred to its existing condition prior to the violation and may assess the Owner of such lot for all costs and expenses incurred in connection therewith.

The Declaration states, in Section 7.05, in relevant part,

(a) Except as otherwise expressly provided herein, the Association shall have the right to enforce any and all of the limitations, restrictions, covenants, conditions, obligations, liens and charges now or hereafter imposed by or pursuant to this Declaration upon the Owner or upon any property within Village Park; and the cost of enforcement, including court costs and attorney's fees, shall be paid by any Owner who violated any such limitation, restriction, covenant or condition or failed to pay or satisfy when due any such lien or charge....

. . . .

(e) The failure in any case to enforce any limitation, restriction, covenant, condition, obligation, lien or charge now or hereafter imposed by or pursuant to this Declaration of Protective Covenants shall not constitute a waiver of any right to enforce the same in another case against or with respect to the same Owner or lot or any other Owner or lot.

Article X(r) of the Association's Design Committee Rules and Regulations (the Rules and Regulations) defines "Retaining Wall" as follows: "Retaining wall shall mean any structure constructed for the purpose of containing or supporting any embankment, fill or other earthen form."

Article XIII(d) of the Rules and Regulations states:

Retaining Walls: Homeowners with sloping grades within their Lots may make these areas unable [sic] by installing retaining walls, provided that the walls do not exceed the allowance height for the location of the wall according to the laws and regulations of the City and County of Honolulu. It is the Owner's responsibility to ensure that all retaining walls are designed and constructed using sound engineering principles.

When the Nishimuras purchased their house and lot, the back area of their lot had a steep slope that was not completely covered with vegetation, and was eroding and unusable. Rain would cause run-off of red dirt and mud. As described by the court in its July 30, 2003 Memorandum of Decision (the Decision), sometime after April 23, 1998, the Nishimuras

began building a three-level lava rock series of walls with steps leading to the upper level in their back lot.... [T]he wall ended up consisting of three tiers, and with black iron railings being placed on top.

Soon after commencement of construction, [the Nishimuras] received verbal complaints from one or more representatives of the Association regarding the lack of Design Committee approval for this work.

... [A]t the time [the Nishimuras] began constructing the three-tiered wall, they not only had constructive notice of the Covenants, but were also at least aware of the possibility that the Association would have to approve improvements to the property, but consciously chose to disregard that possibility.

(Footnote omitted.)

On August 12, 1998, the Nishimuras requested approval from the Design Committee for the construction of a trellis "on hill side center of second wall[.]" Without saying anything about the existence of a "second wall", the Design Committee approved this request on or about August 23, 1998. The trellis, however, was not constructed at this location. It was constructed on the ground level adjacent to the house.

On September 14, 1998, the Nishimuras requested the Design Committee's approval for construction of a fence not to exceed six feet in height on the "hillside". The Design Committee disapproved this request because there was "no plan and drawing provided."

On October 2, 1998, the Nishimuras requested approval from the Design Committee for "[d]ecking w/trellis and fence not to exceed 6' in height behind and above last wall[.]" Without saying anything about the existence or height of a "last wall", the Design Committee disapproved this request and

instructed the Nishimuras to "[w]ork it out with your *Neighbor!*" On October 10, 1998, the Nishimuras amended this request and sought approval from the Design Committee for a "[f]ence not to exceed higher than community fence (18″–2 1/2′ high) behind third wall." On October 26, 1998, without saying anything about the existence of a "third wall", the Design Committee approved this amended request with the following instructions: "Not to exceed *30* [inches] off the Ground! Coordinate it with Neighbor."

By the end of 1998, the Nishimuras had completed the three lava rock walls, each with an iron railing on it. By the spring of 1999, the Nishimuras had completed the deck, a six-foot fence, a trellis on the ground level behind their house, and tall light poles in the makai (toward the ocean) corners of the deck, with floodlights that would shine toward the upper neighbor's property. They also had placed two large wooden picnic tables on the deck with two large, tall, shade umbrellas in the middle of the tables.

On June 2, 1999, the Association presented the Nishimuras with its "First Notice for Covenants/House Rule Violation(s)" that stated:

> **Violation:** Construction of deck and structure on ground level of back yard (not according to design application submitted); erection of fence more than three feet higher than the community property fence.
>
> **Action Required:** Remove unauthorized structures.
>
> **Compliance required by July 2, 1999.**

The notice was silent regarding the rock walls, the three levels of yard, and the connecting steps.

At the meeting of the Association's Board of Directors on June 23, 1999, the Nishimuras resubmitted a design application for their deck, fence, and trellis. On or about June 28, 1999, the Association's property manager responded by letter, in relevant part, as follows:

This letter is to confirm the decision of the Board of Directors at the June 23, 1999 Board meeting:

The Board has decided to accept the Design Applications for the deck and trellis. However, they will not act upon approval of the application [u]ntil the following violations are corrected.

1. Trellis: Should not exceed the height of the property fence and placed on the center of second wall. Please refer to the Design application dated August 17, 1998 which states the approved location.

2. Decking: Construction of this structure was not approved. Please refer to the design application dated October 6, 1998 which was disapproved. This unauthorized structure must be removed immediately.

3. Fence: The fence you have constructed is more than three feet higher than the community property fence. According to the Design Application dated October 26, 1998, the fence height was not to exceed 30″ from the ground level and approval from the neighboring property owner was requested.[1]

(Footnote added.)

After the bench trial, in a forty-five page Decision, the court found and concluded, in relevant part, as follows:

> By late summer or fall of 1999, Defendants had retained Alex Sonson, Esq., to represent them in their disputes with the Association. By early September 1999, attorney Sonson had spoken with Association representatives regarding what to include with Defendants' anticipated resubmissions requesting retroactive approval. On or about September 9, 1999, the Association's then Property Manager, Caeser Paet, wrote to attorney Sonson, requesting that Defendant furnish "all documentation required with his design submission."
>
> Around this time, Defendants apparently decided to belatedly seek a building permit for the improvements as they had been

---

1. The June 28, 1999, letter shows that the Plaintiff–Appellee and Cross–Appellant, Village Park Community Association (the Association): (1) recognized the difference between accepting a tardy application and not accepting it; and (2)

believed that it had the option of not acting upon an application until violations were corrected. It appears, however, that the Association did not recognize that its letter was, in fact, its decision on the merits of the application.

built because the improvements as constructed differed from those depicted in earlier permits. The diagrams for this application, submitted sometime in the fall of 1999, show a retaining wall with "new" levels, referring to the level or levels permitted in 1998 as "existing." In addition to those additional levels, this permit application shows "new" iron railings, a "new" six foot wood fence, and "new" open trellis, and "new" steps to the deck. These improvements had all been completed by the spring of 1999. On October 7, 1999, the DPP issued Building Permit No. 500600 based on these submissions.

Thereafter, on or about October 28, 1999, Defendant Steven Nishimura responded via fax to Caesar Paet's September 9, 1999 letter to his attorney. With the fax, Defendant transmitted four Applications, requesting retroactive approval for:

Rock wall terrace,

Railings on rock walls,

Trelis, and

Decking.

Along with these applications, Defendant enclosed Building Permit No. 500600, a certification from the DPP certifying that the work thereunder had been completed in conformance with applicable building codes and regulations, and the diagrams referenced above.

On or about November 24, 1999, the Design Committee disapproved all four of these Applications, with the notations, "*See Notes.*" The notes were not received in evidence, but appear to have been made on copies of the diagrms [sic] submitted with the building permit application, and were returned to Defendants. The court finds that these November 24, 1999 disapprovals were provided to Defendants, despite assertions to the contrary.

On or about January 19, 2000, the Association's new property manager, Ed Leis, transmitted to Defendant Steven Nishimura a letter stating:

At the regular Board of Directors meeting of Village Park Community Association held on Wednesday, January 12, 2000, the Board found the following regarding your alterations:

1. Design applications were denied.

2. New applications submitted were identical to the first design applications.

3. Work has commenced or has been completed without approval.

The Board of Directors would like to help you in the approval process for your alterations. Therefore, please call me to schedule a video walk of your property with two members of the Board, the Association's architect, and a member of Cadmus Properties.

It is imperative that you schedule this before February 1, 2000, so that we can determine whether or not your alterations meet the standards for such alterations.

It is hoped that you will concur that this is an easier way of moving the approval process forward without resubmittal of new applications for alterations at this time.

. . . .

Instead of allowing a video walk through as requested by the Association, Defendants' attorney, Alex Sonson, responded by [sic] Ed Leis on January 28, 2000, as reflected in his January 31, 2000 letter, which states:

This letter is to commemorate our telephone conversation on Friday, January 28, 2000, regarding Mr. Steven Nishimura's alterations of his home located at 94–694 Ka'aoki Place. I informed you during our said conversation that Mr. Nishimura will resubmit plans and drawings approved by the City & County of Honolulu building department in lieu of the requested site inspection. The plans will be drafted by a professional draftsman for better clarity to the Village Park Community Association ("Association"). Mr. Nishimura informed me today that he will need approximately thirty days to resubmit his plans for the Association's approval.

. . . .

Around January or February of 2000, Defendant Steven Nishimura resigned from his position as a member of the Association's Board of Directors.

Thereafter, on or about February 25, 2000, Defendants submitted four Applications, requesting Design Committee approval for:

Iron railing (wrought iron);

Wood decking;

Trelis; and

Rock wall.

With these Applications, the Defendants enclosed the plans in evidence as Exhibit D–24.

Instead of the customary Design Committee notations of approval or disapproval, on this occasion, [the Association] responded as follows via a letter dated March 3, 2000:

Thank you for resubmitting applications and drawings for four modifications/additions/improvements to your properties as follows:

1. Wood Decking

2. Rock Wall

3. Trellis

4. Iron Railing

The Board of Directors and the Design Committee find that request is beyond the scope of the Committee to the extent of your requested changes. Your application and drawings will be sent to the Association Architect. The firm of Kober/Hanssen/Mitchell Architects . . . will review your documents. The cost of this review is $220.00.

. . . .

The fee is permitted pursuant to Section 4.02(a)(3) of the Covenants. Defendants paid the $220.

On March 17, 2000, the architects transmitted a letter to the Association regarding Defendants['] submissions. This letter stated:

Kober/Hanssen/Mitchell Architects has reviewed the drawing submittal for the above referenced projects.

The overall design appears to be in compliance and we recommend approval with the exceptions of the following that requires clarifications and additional information from the Owner.

*Rock Wall*

1. Dimension shown between the retaining walls on the rockwall plan is not the same with the dimensions shown deck/trellis plan. Owner to clarify which is correct.

2. There is a 6'–0" maximum wall height at the 5'–0" setback area shown but not reflected on the deck/trellis plan wall section A–A. Owner to clarify if this is a requirement.

*Wrought Iron Railings:*

1. Submit paint color for the iron railings. Color shall match the existing building color.

*Wood Decking:*

[1.] Submit paint color for the wood decking framing, stair and railing. Color to match with the existing building color.

*Wood Trellis:*

1. Clarify the material to be used for the arch screened below the trellis.

2. Submit paint color for the wood trellis, framing, posts and screened materials.

3. Submit two photos of the current dwelling as required and mentioned in the VPCA Design Committee Rules.

This review is only for compliance with the community planning and design standards. The Owner is responsible for obtaining any necessary City and County building permits and for complying with all applicable codes, ordinances and regulations . . . .

The Association enclosed the March 17, 2000 letter in a letter dated March 21, 2000 to the Defendants, stating:

Enclosed please find the prompt reply from the Association Architects in ref-

erence to your four proposed modifications or additions. The letter from Kober/Hanssen/Mitchell Architects is dated March 17, 2000.

They find that the overall design appears to be in compliance but find eight areas that need clarification or additional information. Please read the letter carefully and submit the answers or information directly to me so that we may conclude this process in a timely manner.

. . . .

In response, sometime after March 28, 2000, Defendants submitted the plans in evidence as Exhibit P–26 and D–25.

The Association's Board discussed the Defendants' improvements during a May 2000 meeting. Thereafter, several days before July 19, 2000, architects from Kober/Hanssen/Mitchell met with Ed Leis, Association attorney James Tharp, and Board President Tessie Viloria at the Balas's up slope property. This meeting is memorialized in the architect's letter dated July 19, 2000.

After receipt of this letter, Ed Leis wrote to the Defendants on July 21, 2000, basically incorporating the architect's comments, but not enclosing the July 19, 2000 letter, and stating:

> The Board of Directors of Village Park Community Association, the Design Committee, and Association Architect, the Association Attorney have found construction discrepancies that deviate from the submittals. The construction is incompatible with the Design Committee's philosophy to preserve and maintain the character and harmony of the existing community. The circumstances and conditions indicate deviations from the plans and compliance with community planning and design standards.
>
> The construction discrepancies and deviations are as follows:
>
> 1. The deck light poles and umbrella structures are not shown on the approved drawing submittal and shall be removed.
>
> 2. All other lighting with Light Source Visibility is not permitted and shall be removed.
>
> 3. Side yard retaining wall heights exceed 6′0″ from the adjacent existing grade, within the side yard setback, and shall be lowered, relocated or removed.
>
> 4. Illegal storage shed structures shall be removed.
>
> 5. The wood deck exceeds the 14′6″ dimension above the lowest finished grade, as shown on the approved submittal, and shall be lowered.
>
> 6. The top of wall height exceeds the 16′0″ dimension above the lowest finished grade, as shown on the submittal, and shall be lowered.
>
> 7. The fence posts at the rear property line exceed the height of the previous fence and shall be lowered or removed.
>
> 8. All comments on previous submittals shall be addressed.
>
> M/M Nishimura, you are responsible for all costs associated with the remedial work required to bring the construction into conformance. The Design Committee may enforce the penalty phase of the VPCA Design Committee Rules. The City and County will be notified of the discrepancies and any City and County building permits rescinded until the above items are remedied to the satisfaction of the Design Committee. . . .
>
> . . . .

The evidence did not reveal how Defendants responded to this letter.

Ed Leis followed through with the architect's recommendation to seek retraction of the City's building permits via letter dated July 21, 2000. On August 30, 2000, Randall Fujiki, the City's Director of Planning and Permitting wrote back to Mr. Leis, stating:

Non–Compliance with Approved
Building Permits

New Rock Wall, Wrought Iron Railings,
Wood Decking and Trellis

Building Permit Nos. 500600 and 423082

Dwelling at 94–694 Kaʻaoki Place

*Tax Map Key: 9–4–114:10*

We are in receipt of your request dated July 21, 2000, to rescind the above-referenced building permits for construction discrepancies as detailed in your July 21, 2000, letter to the homeowners. Unfortunately, we are unable to rescind the building permits because the building permit plans conformed with the applicable County ordinances, and henceforth were approved. Work is being completed, to the best of our knowledge, in accordance with applicable codes and regulations.

An inspection was conducted on August 9, 2000 to investigate your concerns. Our findings our [sic] summarized below (in bold):

1. The deck light poles and umbrellas structures are not shown on the submittals and shall be removed.—**The light poles were removed on August 3, 2000.**

2. All other lighting with Light Source Visibility is not permitted and shall be removed.—**An electrical permit is not required for the temporary lighting that was installed.**

3. Side yard retaining wall heights exceed 6′0″ from the adjacent existing grade, within the side yard setback, and shall be lowered, relocated or moved.—**The wall was constructed in accordance with the approved plans.**

4. Illegal storage shed structures shall be removed.—**Two 9′ × 6′ sheds were located within the required yard. A Notice of Violation will be issued for the setback violation.**

5. The wood deck exceeds the 14′6″ dimension above the lowest finished grade, as shown on the submittal, and shall be lowered.—**The wood deck was generally constructed in accordance with the approved plans.**

6. The top of wall height exceeds the 16′0″ dimension above the lowest finished grade, as shown on the submittal, and shall be lowered.—**The wall was generally constructed in accordance with the approved plans.**

7. The fence posts at the rear property line exceed the height of the previous fence and shall be lowered or removed.—**The fence post was removed on August 3, 2000.**

As noted in item no. 4, a Notice of Violation shall be issued to the owners for the setback violation of the two storage shed structures. However, we do not fee [sic] that there is sufficient cause to revoke any building permits that were issued. *Our department does not administer or enforce private restrictive covenants; we hope that you are able to resolve these issues directly with the property owners.* [Emphasis added.]

. . . .

C. 2001 AND FILING OF THIS LAWSUIT

The Association and Defendants never resolved their differences. On March 12, 2001, the Association's trial counsel wrote a letter to Alex Sonson, Defendants' attorney, threatening litigation if the "violations" were not removed by March 31, 2001. This lawsuit was filed on August 2, 2001.

(Footnotes and brackets omitted; emphases in original.)

On August 2, 2001, the Association filed a complaint (1) seeking a declaratory judgment that the covenants are lawfully enacted pursuant to Hawaiʻi law and are binding on the Nishimuras; and (2) alleging that the Nishimuras have "erected and/or caused to be erected improvements, including but not limited to, a rock wall terrace, a trellis, decking and railings on the rock wall, without the consent of the Design Committee" and seeking "an Order directing that the improvements . . . be removed and the [property] be

restored to its condition prior to the erection of the improvements."

In his opening statement at the bench trial on June 3 and 4, 2003, the attorney for the Association stated, in relevant part, as follows:

> The Nishimuras claim that the structures they have erected is [sic] nothing more than a retaining wall which is necessary to make their lot usable.
>
> The [A]ssociation claims that the structure is something else entirely. The Nishimuras claim that their structure is not more than 30 inches off the ground. The [A]ssociation claims it's more than 16 feet off the ground. The Nishimuras claim that their fence is no higher than the property fence. The [A]ssociation claims otherwise. How can the parties not be able to agree on simple measurements? On the meaning of plain language such as no higher than the property fence or not exceeding 30 inches off the ground, the parties have agreed that the court should make a site visit which will be helpful for the court to understand how these disagreements could have come about. The site visit would be first from the neighbor's property, the Balas. And next from the Nishimuras' property.
>
> Finally, Your Honor, it's not the task of this court to determine whether or not it likes the improvements or whether it agrees with the [A]ssociation that the Nishimuras' improvement should not have been built. It is for this court to decide whether or not the [A]ssociation acted consistent with its obligation under the covenants and carried out its obligation in a reasonable manner.

In his opening statement, the attorney for the Nishimuras stated, in relevant part, as follows:

> Now, ... there are three things I guess at issue. Just two now. I am not sure. There is a trellis that my clients built behind their house. As far as we know, the [A]ssociation doesn't really have any complaint about the trellis. None of the neighbors are complaining about the trellis.
>
> Second issue, is back retaining walls. Now, it's again, as far as we know, no neighbors are complaining about the back retaining walls.... They do have a rule for retaining walls. What that rule says explicitly clearly is you, home owner, if you have a sloping lot, you can use the retaining wall to make the back area useful.... What the rule says is, go to the City and County rules for retaining walls.
>
> Now, my evidence is going to show my client got a building permit.... What he built is in accordance with the plans....
>
> ... The only issue that's left is on the top of the last terrace area there is a deck that my clients built.

During closing argument by the attorney for the Association, the following was stated, in relevant part:

> The evidence also shows that there were several, as a matter of fact, eleven, applications that the [Nishimuras] made to the design committee. And those applications were either approved with conditions or denied.[2]
>
> ....
>
> ... Question is, what's a retaining wall?
>
> ... It says, "retaining wall. Retaining wall shall mean any structure constructed for the purpose of containing or supporting any embankment, fill or other earthen form."
>
> Now, what we have here, ... is not a structure. That was designed solely for the purpose of containing the earth. What we have is rather than a retaining wall, we have a terrace and this is the rub in this case, Your Honor, that on top of that terrace is a deck. And you can't put a deck on a retaining wall.[3]
>
> ....

---

**2.** In other words, counsel for the Association admitted that the July 21, 2000, letter from its managing director to the Defendants–Appellants and Cross–Appellees Steven and Elizabeth Nishimura (the Nishimuras) was an approval with conditions.

**3.** The evidence is clear that most, if not all, of the deck is on a terrace supported by a retaining wall.

... I take the position that under the covenant, ... if they chose to, the Nishimuras could have done this. They could have built a retaining wall and gotten the use of all of this property. This would have been a retaining wall. Retaining wall does not support a deck. What they have built was something beyond the purpose of a retaining wall.

THE COURT: Do you know whether or not the City and County would allow a 16 foot retaining wall up against the property line?

. . . .

[COUNSEL FOR THE ASSOCIATION]: I don't know but for the purpose of this argument I am willing to assume ... that the City and County would allow them to build a ... great wall of China in the back yard but because ... the City and County allows it, allows the structure, does it make it a retaining wall and doesn't dictate what the design committee will accept or not accept? It shouldn't. Because the covenants are more restrictive than common law principle or the municipal code. So there in [sic] lies the rub, Your Honor. If I may get the point, I think the question here is, is this structure consistent with the definition of retaining wall in the covenant. And if it is not consistent, if it's something more, then the design committee has a right to disprove it. It's stuck with it because of its own rules if it is in fact a retaining wall constructed for the purpose of securing the earth.... [4]

. . . .

[COUNSEL FOR THE NISHIMURAS]: ... [T]he only thing that's recorded which is P one, which is the declaration. There is also all sorts of definitions here. And there isn't any definition whatsoever of a retaining wall.

Furthermore, even if you go to his definition of the retaining wall which isn't recorded, it says, "retaining wall shall mean any structure constructed for the purpose of containing or supporting any embankment, fill or other earthen form."

... [N]ow ... finally, the [A]ssociation has said for the first time what its problem is. What the problem is, ... is ... you can't put a deck on a retaining wall.

(Footnotes added.)

The Nishimuras asserted the following defenses: (1) ineffectiveness of the actions of the Design Committee due to improper composition of the Design Committee; (2) lack of standing to enforce violations; (3) selective enforcement, abandonment and/or changed circumstances; (4) statute of limitations; (5) laches; (6) estoppel; (7) acquiescence; (8) unclean hands; (9) acceptance; and (10) waiver.

In the Decision, a part of which is quoted above, the court decided that none of the Nishimuras' defenses had any merit. The Decision also stated, in relevant part, as follows:

6. *Estoppel*

Equitable estoppel applies in the following situations:

> The rule of law is clear that where one by his words, or conduct, wilfully causes another to believe the existence of a certain state of things, and induced him to act on that belief so as to alter his previous position, the former is precluded from averring against the latter a different state of things, as existing at the same time.

It is unclear what "certain state of things" is being alleged by Defendants. It could be an alleged ability of homeowners to make improvements without Design Committee approval. There is no evidence, however, that Plaintiff "wilfully caused" Defendants to believe the existence of such a state of things. Thus, "equitable estoppel" does not apply on this basis.

Defendants could also be arguing that the Plaintiff is estopped from asserting lack of consent based on the Association's

4. Subsequently, the court noted that "Exhibit P–29B shows that [the Nishimuras'] next door neighbor had a similar rock retaining wall, although two tiered." Exhibit P–29B is a copy of a photograph of the next door neighbor's walls. It shows that the second (higher) tier is higher than the Nishimuras' second tier but lower than their third tier. The Association did not explain.

actions beginning in mid-June 1999 through 2000. In this regard, the evidence shows that Plaintiff continuously objected to the Defendants' improvements in 1998 and until mid–1999. From June 28, 1999, however, the Association acted in a way suggestive of cooperation and possible approval of Defendants' improvements.

A fundamental requirement for the application of estoppel is, however, that the party asserting estoppel was induced by the other party *to act on that belief so as to alter his previous position.* In this case, all the improvements had been completed by the spring of 1999. The Defendants did "change their position," however, with respect to their payment of the $220 fee for architect review. The court readdresses this issue in Section IV below.

### 7. *Acquiescence*

Defendants' answer plead "acquiescence" as a separate affirmative defense. The court has addressed the defense of laches based on acquiescence. The law also recognizes "estoppel by acquiescence," which is described by *Black's* as follows:

> Acquiescence is a species of estoppel. An estoppel arises where party aware of his rights sees other party acting upon mistaken notion of his rights. Injury accruing from one's acquiescence in another's action to his prejudice creates "estoppel."

The analysis for "estoppel by acquiescense" is therefor [sic] the same as that for "equitable estoppel" in Section III(B)(6) above.

### 8. *Unclean Hands*

The doctrine of "unclean hands" is a part and parcel of "the age-old maxim of jurisprudence that those 'who seek equity must do equity.' In other words, the court should not call upon its equitable powers in the name of justice to benefit a party who comes before the court with 'unclean hands.'"

In the court's view, if either side has "unclean hands," it is the Defendants, not the Plaintiff. While having actual notice of Section 4.02 of the Covenants, Defendants chose to continue, commence, and complete building improvements without Association approval. Therefore, this doctrine is not available to the Defendants.

### 9. *Acceptance*

Construing Defendants' affirmative defense of "acquiescence" beyond "laches predicated on acquiescense" and "estoppel by acquiescense," the court also addresses the potential defense of whether Plaintiff actually acquiesced to or accepted at least some of the improvements through its interactions with the Defendants from mid-June 1999 through 2000.

Section I(C) above outlines the six step procedure mandated by Section 4.02 of the Covenants, which was supposed to be followed by Defendants to commence or continue the improvements at issue.

An argument can be made that the March 3, 2000 letter from the Plaintiff to Defendants, especially based on the request for payment of the review fee of $220, constitutes a step (2) preliminary acceptance of Defendants' February 25, 2000 Applications requesting Design Committee approval for (1) the railings on the three-tiered wall; (2) the wood decking; (3) the trellis; and (4) the three-tiered rock wall.

If that argument is accepted, it could be further argued that the Plaintiff's March 21, 2000 response to the Defendants was a step (4) written itemization containing reasons for disapproval, and that the Defendants' March 28, 2000 submission of the revised final plans constituted a step (5) resubmission of revised final plans. Following this line of reasoning, the Plaintiff's failure to respond to the March 28, 2000 within 15 days could be deemed a step (5) approval of the corrected final plans.

The court rejects these possible arguments. Section 4.02 by its very terms sets conditions on the "commencement" or "continuation" of residential improvements, and does not address improvements that have been "completed" with none of the required approvals. In addition, it would be inequitable to foist Rule 4.02 of the Covenants on the Association, to the Association's clear detriment, when the Defendants had flagrantly and continuously vio-

lated the Rule, and had completed all of the improvements at issue without Design Committee approval.

Rather, the court construes the Association's actions from mid-June 1999 through 2000 as its attempt to be reasonable, avoid litigation, and make sense of a untenable situation created by the Defendants' improper actions.

In addition, by late June 1999, the disputes between the Association and the Defendants had become very contentious, and Defendants had retained counsel to communicate with the Association.

Therefore, although this issue was not raised, the court alternatively finds and concludes that the Association's responses to the Defendants after [sic] from mid-June 1999 through 2000 are actually compromise negotiations subject to Rule 408 of the Hawaii Rules of Evidence, and cannot be used to "prove ... invalidity of the claim ...(.)"

10. *Waiver*

Although alluded to in Defendants' November 15, 2002 Responsive Pretrial Statement, the affirmative defense of "waiver" was not specifically pled in the Answer filed October 3, 2001. Although not specifically pled or argued by the Defendants, because the evidence suggests a possibility of waiver, and because the pleadings are amended to conform to the evidence, the court also addresses this defense.

Waiver is the "intentional relinquishment of a known right, or such conduct as warrants an inference of such surrender, and *it is not essential to its application that prejudice results to the party in whose favor the waiver operates.*" Waiver includes the "intentional relinquishment of a known right," a "voluntary relinquishment of some rights," and "the relinquishment or refusal to use a right." A waiver "may be expressed or implied," and "may be established by ... agreement, or by acts and conduct from which an intention to waive may reasonably be inferred."

For the reasons stated in Sections III(B)(5) and (9) above, however, the court finds and concludes that there was no effective waiver of the Plaintiff's position in this case. In addition, waiver is [an] equitable defense. For the reasons stated in Section III(B)(9) above, the court also finds and concludes that, under the circumstances, it would be inequitable to provide the Defendants with the benefit of this equitable defense.

....

... Moreover, H.R.S. Section [603–21.9(6)], explicitly provides that this court has the power to "make ... such judgments, ... orders, ... and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to it by law *or for the promotion of justice in matters pending before it.*"

In this regard, if the Defendants had properly submitted approval requests pursuant to Section 4.02 of the Covenants, the Plaintiff would have been subject to the Hawaii Supreme Court's holding in *McNamee v. Bishop Trust Co., Ltd.*, that restrictive covenants requiring submission and approval of plans are enforceable only if the authority to consent or approve is exercised reasonably and in good faith. The court therefore concludes that, under the circumstances of this case, it would be inequitable to order a blanket mandatory injunction requiring removal of all improvements without analyzing whether, if applications had been properly submitted, they could have been disapproved under an "acting reasonably and in good faith" standard.

Therefore, the court will go through an a [sic] *McNamee* analysis for each improvement at issue, to determine whether its removal should be ordered.

(Footnotes and brackets omitted; emphases in original.)

The court concluded "that it would have been unreasonable for the Association to withhold consent to this specific retaining wall. Accordingly, the Association's request for an injunction requiring removal of the three-tiered wall is denied."

The Court required the Nishimuras "to repaint the iron railings in a color complementary to their main dwelling unit."

The court concluded "that it would have been unreasonable for the Association to withhold consent to this specific trellis."

The court decided that "[b]ecause the Association had approved a 30 inch fence, which now exists, and does not have concerns with the color of said fence, ... it would have been unreasonable for the Association to withhold consent to the fence as it now exists, after being cut down to 30″ from six feet, except for the color of the posts." The court ordered the Nishimuras "to repaint the iron railings on the retaining wall and the fence posts for the 30 inch wall parallel to the back boundary of their property in a color complementary to their main dwelling unit[.]"

The court concluded that

"it would not have been unreasonable for the Association to refuse consent to the deck and its attachments."

Therefore, the Association's request for a mandatory injunction requiring removal of the deck along with the improvements appended thereto, which are the light poles and tables with umbrellas, is granted.

The court also ordered that the final judgment in favor of the Association shall "include reasonable attorneys' fees and costs pursuant to Sections 4.02(c) & (h) and 7.05 of the Covenants."

On August 11, 2003, the Nishimuras filed a motion for reconsideration regarding the award of attorney fees and costs in which they argued that they "were the prevailing party in this matter pursuant to binding Hawaii case law and H.R.S. [Hawaii Revised Statutes] § 607–14, or HRS § 42J–10 [sic]." HRS § 607–14 (Supp.2004) and § 421J–10 (Supp.2004) state, in relevant part, as follows:

§ 607–14 **Attorneys' fees in actions in the nature of assumpsit, etc.** In all the courts, ... in all actions on a ... contract in writing that provides for an attorney's fee, there shall be taxed as attorneys' fees, to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable; provided that the attorney representing the prevailing party shall submit to the court an affidavit stating the amount of time the attorney spent on the action and the amount of time the attorney is likely to spend to obtain a final written judgment, or, if the fee is not based on an hourly rate, the amount of the agreed upon fee. The court shall then tax attorneys' fees, which the court determines to be reasonable, to be paid by the losing party; provided that this amount shall not exceed twenty-five per cent of the judgment.

Where the note or other contract in writing provides for a fee of twenty-five per cent or more, or provides for a reasonable attorney's fee, not more than twenty-five per cent shall be allowed.

Where the note or other contract in writing provides for a rate less than twenty-five per cent, not more than the specified rate shall be allowed.

. . . .

The above fees provided for by this section shall be assessed on the amount of the judgment exclusive of costs and all attorneys' fees obtained by the plaintiff, and upon the amount sued for if the defendant obtains judgment.

Nothing in this section shall limit the recovery of reasonable attorneys' fees and costs by a planned community association and its members in actions for the collection of delinquent assessments, the foreclosure of any lien, or the enforcement of any provision of the association's governing documents, or affect any right of a prevailing party to recover attorneys' fees in excess of twenty-five per cent of the judgment pursuant to any statute that specifically provides that a prevailing party may recover all of its reasonable attorneys' fees. "Planned community association" for the purposes of this section means a nonprofit homeowners or community association existing pursuant to covenants running with the land.

[§ 421J–10] **Attorneys' fees and expenses of enforcement.** (a) All costs and expenses, including reasonable attorneys' fees, incurred by or on behalf of the [planned community] association for:

(1) Collecting any delinquent assessments against any unit or the owner of any unit;

(2) Foreclosing any lien on any unit; or

(3) Enforcing any provision of the association documents or this chapter;

against a member, occupant, tenant, employee of a member, or any other person who in any manner may use the property, shall be promptly paid on demand to the association by such person or persons; provided that if the association is not the prevailing party, all costs and expenses, including reasonable attorneys' fees, incurred by any such person or persons as a result of the action of the association, shall be promptly paid on demand to the person by the association. The reasonableness of any attorney's fees paid by a person or by an association as a result of an action pursuant to paragraph (2) shall be determined by the court.

On September 3, 2003, the court entered an order which stated, in relevant part, as follows:

Even though [the Association] did not obtain injunctive relief requiring removal of all the unauthorized improvements, the evidence at trial indicated that [the Nishimuras'] unauthorized construction of the upper deck was the main problem that lead [sic] to this lawsuit. In addition, [the Association] did, in large part, prevail on its claim for declaratory relief. Moreover, the court was not required to attempt to fashion a remedy more equitable to the [Nishimuras], but did so, despite the strength of [the Association's] legal position. Therefore, despite [the Nishimuras'] arguments, [the Association] is the prevailing party.

Under the totality [of] circumstances, and reviewing the itemized bills submitted by [the Association's] counsel, the court awards [the Association] $17,500 as reasonable attorneys' fees. Although no specific objection was raised, the court will disallow [the Association's] claims [for] copying charges, because no explanation was provided. In addition, the court disallows [the Association's] claims for costs for messenger services. This should be included as part of the normal overhead of a law firm's services. In addition, no explanation is provided for claims of $2.50 per page for fax charges, as well as for postage, and these are disallowed. This amounts to a disallowal of all costs claimed by [the Association].

On September 9, 2003, the Nishimuras filed a notice of appeal. On September 23, 2003, the Association filed a notice of cross-appeal. This case was assigned to this court on August 24, 2004.

## DISCUSSION

Stated briefly, the Nishimuras assert the following two points on appeal:

1. The Nishimuras prevailed because they were allowed to keep four of the five challenged improvements, and the Association's demand for a mandatory removal of four of the five challenged improvements was rejected, and it was error to award attorney fees to the Association.

2. The court erred when it denied the statute of limitations, selective enforcement, abandonment, changed circumstances, acceptance, waiver, and acquiescence defenses.

The Association asserts the following point on appeal: "[i]n order to apply the *McNamee[ v. Bishop Trust Co., Ltd.*, 62 Haw. 397, 616 P.2d 205 (1980) ] test the court had to reverse its own finding that the [Nishimuras] had not complied with the application procedure." Therefore, the court erred when it applied the "good faith and reasonableness" standard regarding the trellis and the three-tiered wall (and, presumably, the iron railings on the three walls).

### A. The Nishimuras' Second Point on Appeal

In the July 30, 2003 Memorandum of Decision, the court decided that the Nishimuras had failed its burden of proving any of their defenses. In light of the record, we conclude that this decision is right.

### B. The Association's Sole Point on Appeal

■ The Association seeks to prevail on the basis of the court's alleged "finding that the [Nishimuras] had not complied with the application procedure." In actuality, the court concluded that "if the [Nishimuras] had

properly submitted approval requests pursuant to Section 4:02 of the Covenants, the [Association] would have been subject to the Hawaii Supreme Court's holding in *McNamee*[.]" The Association construes this to be a conclusion that the Association is not subject to the holding in *McNamee*. The Association argues that "[i]n order to apply the *McNamee* test the court had to reverse its own finding that the [Nishimuras] had not complied with the application procedure." We disagree.

The court did not conclude that if the [Nishimuras] had **not** properly submitted approval requests pursuant to Section 4:02 of the Covenants, the [Association] would **not** have been subject to the Hawaii Supreme Court's holding in *McNamee*. Similarly, the court's decision regarding the Nishimuras' defenses is not a decision that the Association was authorized to deny the Nishimuras' applications on the basis that they were untimely made post-construction. On the contrary, the Association unconditionally considered the merits of the Nishimuras' post-construction applications. In the words of the Association's attorney in his closing argument, the Association "either approved with conditions or denied" those applications in its July 21, 2000 letter to the Nishimuras. In doing so, the Association waived whatever right(s) it may have had arising from the fact that the Nishimuras' application was an untimely post-construction application.[5]

Consequently, *McNamee* is applicable. In that case, the McNamees properly applied to the Managing Committee pre-construction of their proposed change. Their application was disapproved. They sued. The circuit court entered a judgment in favor of defendant Bishop Trust Co., Ltd. In the body of its opinion, the Hawai'i Supreme Court concluded (1) that "[t]he main issue presented in this case is whether the trial court erred in finding the Managing Committee's decision to be reasonable and made in good faith", *Id.* at 402, 616 P.2d at 208, and (2) that "[t]he Managing Committee's decision to reject the plaintiffs' application was reasonable and

made in good faith[.]" *Id.* at 410, 616 P.2d at 213.

In accompanying footnote no. 10, the Hawai'i Supreme Court stated:

> The trial court's focus on the reasonableness of the Committee's actions rather than on the reasonableness of plaintiffs' plans was well taken. Plaintiffs' presentation of their case was directed towards showing that their plans for construction were reasonable. However, this is not a question for a court either at the trial or appellate level to consider. The body most suited for this determination was the WPCA's designated board—the Managing Committee. The trial court's task was to see that the Committee's decision was not arbitrary or made in bad faith. In turn we are limited in our review to whether this determination was supported by substantial evidence.

*Id.* at 402 n. 10, 616 P.2d at 208 n. 10. Although we recognize that there are more ways to be unreasonable than by being arbitrary, we interpret "arbitrary or made in bad faith" as intended to be the flip side of "reasonable and made in good faith." We conclude that when the property owner is the plaintiff and has the burden of proof, the plaintiff-property owner's burden is to prove that the committee/association's decision was unreasonable and/or made in bad faith. In contrast, when the association is the plaintiff and has the burden of proof, the plaintiff-association's burden is to prove that the committee/association's decision was reasonable and made in good faith.

In the instant case, based on *Sandstrom v. Larsen,* 59 Haw. 491, 583 P.2d 971 (1978), and *McNamee*, the trial court decided the question "whether, if applications had been properly submitted [pursuant to Section 4.02 of the Covenants], they could have been disapproved under an 'acting reasonably and in good faith' standard." In our view, the "if applications had been properly submitted [pursuant to Section 4.02 of the Covenants]"

---

**5.** If an improper post-construction application requires an order of removal and nothing prohibits a post-removal re-application, a homeowner could be (a) required to remove an improvement,

(b) allowed to submit a proper pre-reconstruction application to reconstruct the improvement, and (c) be allowed to reconstruct the improvement.

language was unnecessary and immaterial. The Association having accepted the applications and the Association's Design Committee having made its decisions, the trial court's task under *McNamee* and *Sandstrom* was: (a) to review these decisions and determine whether the Association had satisfied its burden of proving that they were reasonable and made in good faith; (b) to affirm them if they were, to reverse them if they were not, or to vacate them if more facts were required prior to making a decision; and (c) where appropriate, to grant or deny requested injunctive and/or other relief.

The trial court implicitly decided that the relevant facts compel the conclusion that the Association's decisions that the Nishimuras must (1) repaint the iron railings and the fence posts in a color complimentary to their main dwelling unit, and (2) remove the deck, light poles, and tables with umbrellas, were reasonable and made in good faith. In light of the record, we conclude that these decisions were right.

■ As to the retaining walls, there is no indication in the Association's July 21, 2000 letter or thereafter pre-trial, that the Association had any questions or objections regarding the walls as they existed at the time of trial. At trial, the Association, via its counsel during his opening statement, insisted that the Nishimuras' "retaining wall" was a "structure" "more than 16 feet off the ground." Based on the relevant facts, the trial court concluded that the Association was not authorized to withhold its consent to this "three-tiered wall" because such withholding of consent would have been unreasonable. In light of the record, this conclusion was right.

There was prior express, albeit preliminary, approval by the Association for a trellis to be built "on hill side center of second wall[.]" As with the retaining walls, the Association in its July 21, 2000 letter had no further questions regarding the trellis built on the ground level although the Nishimuras' renewed application for that trellis was before it and it had viewed the Nishimuras' property. Based on the relevant facts, the trial court concluded that the Association was not authorized to withhold consent to this

trellis because such withholding of consent would have been unreasonable. In light of the record, that conclusion was right.

## C. The Nishimuras' First Point On Appeal

■ The Nishimuras contend that the court reversibly erred when it ordered them to pay attorney fees to the Association. The Nishimuras argue that they were the prevailing parties considering that the court ordered them to remove only one of the five improvements the Association sought to remove.

We disagree that the Nishimuras were the prevailing parties. As noted above, the Association sought the removal of the following five items: (1) the three retaining rock walls creating the three terraces, (2) the iron railings on the rock walls, (3) the trellis on the ground level, (4) the thirty-inch fence and fence posts, and (5) the deck. The Nishimuras resisted all changes. They sought to keep each of the five items as is. The court ruled in favor of the Nishimuras as to two of the items. The court ruled in favor of the Association completely as to one of the items and partially as to two. In other words, the Nishimuras were permitted to keep only two of the five items as is.

■ The relevant precedent is as follows:

Defendant maintains that Plaintiffs are the "losing party" because the trial court awarded them only "nominal damages." While there is some case law supporting Defendant's position, the majority view is that when a jury finds for the plaintiff as to liability, the plaintiff is the prevailing party and entitled to costs even though the jury determines that the plaintiff has suffered no more than nominal damages. 10 C. Wright, S. [A.] Miller & M. Kane, Federal Practice and Procedure: Civil § 2667, at 186–87 (2d ed.1983) (discussing Rule 54(d), Federal Rules of Civil Procedure, which is representative of the usual approach to allowing costs to the "prevailing party"). See also, *Three–Seventy Leasing Corp. v. Ampex Corp.*, 528 F.2d 993 (5th Cir.1976); *Western Decor & Furnishings Indus., Inc. v. Bank of America Nat'l*

*Trust and Sav. Ass'n,* 91 Cal.App.3d 293, 154 Cal.Rptr. 287 (1979); *I.A. Schafer v. Southern Ry. Co.,* 266 N.C. 285, 145 S.E.2d 887 (1966); *Miles v. F.E.R.M. Enter., Inc.,* 29 Wash.App. 61, 627 P.2d 564 (1981). As stated in Moore's Federal Practice, "[i]n general, a party in whose favor judgment is rendered by the district court is the prevailing party in that court, plaintiff or defendant, as the case may be. Although a plaintiff may not sustain his entire claim, if judgment is rendered for him he is the prevailing party" for purposes of costs and attorneys' fees, 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 54.70[4], at 54–323—54–324, (2d ed.1992) (citations omitted).

Similarly, in Hawai'i, our supreme court has pronounced as a general rule that "where a party prevails on the disputed main issue [in a case], even though not to the extent of his original contention, he will be deemed to be the successful party for the purpose of taxing costs and attorney's fees." *Food Pantry, Ltd.,* 58 Haw. at 620, 575 P.2d at 879. The trial court is required to first identify the principle issues raised by the pleadings and proof in a particular case, and then determine, on balance, which party prevailed on the issues. *Id.*

*MFD Partners v. Murphy,* 9 Haw.App. 509, 513–15, 850 P.2d 713, 715–16 (1992). In light of this precedent, we conclude in this case that the Association was the prevailing party.

Accordingly, we affirm the September 3, 2003 Final Judgment.

Concurring and Dissenting Opinion by FOLEY, J.

I concur in the majority opinion that the appeal of Defendants/Appellants/Cross–Appellees Steven and Elizabeth Nishimura (Nishimuras) is without merit. I respectfully dissent, however, to the majority opinion that the cross-appeal of Plaintiff/Appellee/Cross–Appellant Village Park Community Association (Association) is equally without merit.

In its cross-appeal, the Association contends the Circuit Court of the First Circuit (circuit court) ignored its factual findings and the standard of review set forth in *McNamee*

*v. Bishop Trust Co., Ltd.,* 62 Haw. 397, 616 P.2d 205 (1980), when the circuit court concluded that it would have been unreasonable for the Association to withhold consent to the specific trellis and retaining wall and denied the Association's request for injunctive relief.

*McNamee* provides that covenants requiring submission of plans and prior consent before construction are valid and enforceable as long as the authority to consent or approve is exercised reasonably and in good faith. *Id.* at 407, 616 P.2d at 211. *McNamee* noted it is not for the trial or appellate court to determine whether the construction plans are reasonable. *Id.* at 402 n. 10, 616 P.2d at 209 n. 10. In the instant case, this is a determination reserved for the Association's Design Committee, which is "most suited for this determination." *Id.* "The trial court's task [is] to see that the Committee's decision was not arbitrary or made in bad faith." *Id.* The circuit court did not adhere to this standard as set forth in *McNamee.* The circuit court reviewed the Nishimuras' trellis and retaining wall and determined they were reasonable; therefore, the circuit court concluded it would have been unreasonable for the Design Committee to withhold approval.

This case is analogous to *Sandstrom v. Larsen,* 59 Haw. 491, 501, 583 P.2d 971, 979 (1978), where there was "a deliberate and intentional or an assumed-risk violation of a restrictive covenant." Such a violation would entitle the Association to injunctive relief. The record in the instant case does not show by substantial evidence that the Design Committee's decision was arbitrary or made in bad faith. *McNamee,* 62 Haw. at 402, n. 10, 616 P.2d at 209 n. 10. I would therefore vacate the circuit court's holding that it would have been unreasonable for the Association to withhold consent to the specific trellis and retaining wall and remand this case for consideration of appropriate injunctive relief regarding the trellis and retaining wall. In all other respects, I would affirm the September 3, 2003 Final Judgment of the circuit court.